Germaine D. STROTHER, M.D.,
Plaintiff–Appellant,

v.

SOUTHERN CALIFORNIA PERMA-
NENTE MEDICAL GROUP, a Califor-
nia partnership; Gary A. Lulejian, an
individual; David Bridgeford, an indi-
vidual, Defendants–Appellees.

Germaine D. STROTHER, M.D.,
Plaintiff–Appellant,

v.

SOUTHERN CALIFORNIA PERMA-
NENTE MEDICAL GROUP; Gary A.
Lulejian, an individual; David Bridge-
ford, an individual; Paul Deiter, an indi-
vidual, Defendants–Appellees.

Nos. 94–56046, 94–56279.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1996.

Decided March 8, 1996.

As Amended on Denial of Rehearing
April 22, 1996.

As Amended on Denial of Rehearing
June 3, 1996.

Theresa M. Traber and Bert Voorhees, Traber, Voorhees & Olguin, Law Office of Traber & Voorhees, Pasadena, California, for the plaintiff-appellant.

David D. Kadue, Seyfarth, Shaw, Fairweather & Geraldson, Los Angeles, California, for the defendants-appellees.

Before: BRIGHT,* SKOPIL, and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge.

Dr. Germaine D. Strother, a physician partner in the Southern California Permanente Medical Group ("Medical Group"), sued the Medical Group and two physician partners in the Medical Group alleging racial discrimination and retaliation under 42 U.S.C. § 1981; racial and gender discrimination and retaliation in violation of the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900 *et seq.;* race discrimination and retaliation in violation of Article I, § 8 of the California Constitution; and arbitrary gender and race discrimination in violation of the Unruh Civil Rights Act, Cal.Civ. Code §§ 51 and 51.5. The district court granted the Medical Group's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on the FEHA discrimination claim, and the Medical Group's motion for summary judgment on all other claims. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm in part and reverse and remand in part.

FACTS

Strother is an African–American female partner in the Medical Group, which provides medical services in Southern California to members of the Kaiser Permanente Health Plan. From 1985 to the present, Strother has worked as a family practice physician in the Medical Group's West Covina clinic. In 1987, Strother received the title of partner in the Medical Group, and in July 1989 she was appointed Assistant Physician-in-Charge ("APIC") at the West Covina clinic.

The West Covina clinic had historically been a part of the Los Angeles Area of the Medical Group. In 1988–91, the Medical Group expanded its services in the San Gabriel Valley, warranting the creation of a new Baldwin Park service area, which included facilities in West Covina and four other communities. Defendant Gary A. Lulejian was appointed to head this new Baldwin Park Area, first as an acting director, and then as Area Associate Medical Director when the area officially opened in 1992. The Medical Group claims that Lulejian set out to reorganize the clinics within the Baldwin Park Area, which included the elimination of the APIC position and the selection of several "Module Lead" physicians overseeing groups of doctors in each clinic.

Lulejian first met with Strother in December 1989. According to the Medical Group, Lulejian had received numerous negative reports about Strother's performance as APIC. Lulejian shared these perceptions with Strother and offered to help her improve her personal leadership skills, but Strother allegedly failed to acknowledge and address Lulejian's observations. Strother claims that Lulejian told her at the meeting that her APIC position "did not exist," that she should stop attending certain administrative meetings, and that she would not achieve any professional advancement in the Medical Group so long as he had the power to prevent it.

From 1990 through the present, the Medical Group made a series of appointments to administrative and committee positions for which Strother claims she was qualified, including Physician in Charge ("PIC") positions at other clinics and Module Lead positions at West Covina, but for which she was neither considered nor appointed. For its part, the Medical Group asserts that others were more appropriate appointees for these positions because of better interpersonal skills and, in some cases, because of medical specialties more appropriate for the positions. The Medical Group contends that Dr. David Bridgeford, PIC for West Covina and an African–American, found Strother to have an "overbearing and abrasive personality style" which disqualified her for certain leadership positions. Strother twice ran to represent the Baldwin Park Area on the Medical Group's Board of Directors, but received only one and two votes out of 45–50 doctors in each of the elections. Her APIC position was phased out as part of the area reorganization, but Strother continues to serve the

* Hon. Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by desig-

nation.

Medical Group as a partner in a variety of administrative capacities.[1]

Starting on May 30, 1991, Strother complained to other partners of the Medical Group, including the Associate Area Medical Director, about the alleged discriminatory promotions and appointments being made by Lulejian. On August 13, 1991, Bridgeford allegedly told Strother that he knew about her complaints and warned that filing a discrimination charge would be against her interests. Strother filed a complaint with the California Department of Fair Employment & Housing on September 12, 1991, alleging violations of Title VII. On September 13, 1991, she was replaced as Personal Physician coordinator. According to Strother, she was later barred from attending several Quality Assurance seminars and committee meetings, and was denied two Quality Assurance positions in 1992. She also alleges that she suffered discrimination and verbal and physical abuse in a number of ways.[2]

On September 15, 1992, Strother commenced an action in the United States District Court for the Central District of California against the Medical Group and several individual partners, including Lulejian and Bridgeford,[3] alleging racial discrimination and retaliation under 42 U.S.C. § 1981; racial and gender discrimination and retaliation in violation of the California Fair Employment and Housing Act, Cal.Gov't Code §§ 12900 et seq. ("FEHA"); race discrimination and retaliation in violation of Article I, § 8 of the California Constitution; arbitrary racial and gender discrimination in violation

of the Unruh Civil Rights Act, Cal.Civ.Code § 51 ("Unruh Act"); and related common law claims. In March 1993, the district court granted the Medical Group's 12(b)(6) motion to dismiss Strother's FEHA discrimination claim "on the grounds that [Strother] is a bona fide partner of the medical group and not an employee for the purpose" of FEHA. Strother later added Cal.Civ.Code § 51.5 to her claims, and abandoned several of her common law claims.

On May 25, 1994, the district court granted the Medical Group's motion for summary judgment on all of Strother's remaining claims. The district court held that under *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), Strother's 42 U.S.C. § 1981 claims based on "post-contract formation" treatment prior to November 12, 1991 were untenable, and that insofar as the claim was based on conduct occurring prior to September 15, 1991, it was barred by the applicable one-year statute of limitations. The court held that Strother had "failed to show that there is a genuine issue as to any material fact to support" her FEHA retaliation claim. Because Strother had "not shown that she was denied the ability to enter or pursue her profession," the district court found that her claims based directly on Article I, § 8 of the California Constitution could not lie. Finally, the district court dismissed Strother's claims under the Unruh Act, Cal.Civ.Code §§ 51 and 51.5 because Strother failed to "qualify as a customer, client, or patron of defendant Medical Group."[4]

1. These include: Triage Physician at the West Covina Urgent Care Center; Physician Liaison to the Chemical Recovery Program, a position that identifies Strother as a contact for physicians who have patients with chemical dependency problems; Physician Mentor to the West Covina Advice Nurse Center; Family Practice Representative on the Pharmacy and Therapeutics Committee, for which she makes recommendations to the Committee at monthly meetings; and coordinator of the West Covina hospitalizing doctors. The exact nature of many of these positions is unclear from the record.

2. Strother alleges, *inter alia,* that she was held to a higher standard of job performance than male doctors; she was required to work under different and more stressful conditions; she was denied secretarial support and other services

granted to other physicians; she was assigned unusually burdensome work schedules; she was denied reimbursement of certain expenses; she was subjected to surveillance, monitoring of her telephone calls, and searches through her personal belongings and documents; she received rude and abusive phone calls; she was subjected to insulting treatment and public ridicule; and that one male doctor once struck her with a clipboard, and that another forced her out of his office with his door.

3. The defendants will be referred to collectively as "the Medical Group" when convenient.

4. Strother does not appeal the district court's grant of summary judgment in favor of the Medical Group on several other claims, including

## DISCUSSION

Strother appeals the district court's decision on her state and federal statutory and state constitutional claims. We reverse the district court's grant of the Medical Group's Rule 12(b)(6) motion on Strother's FEHA claim and remand for further proceedings. We also reverse and remand the district court's grant of summary judgment in favor of the Medical Group on Strother's FEHA retaliation claim and her claim under revised 42 U.S.C. § 1981, insofar as it is based on her treatment after November 12, 1991. We affirm the district court's grant of summary judgment in favor of the Medical Group on Strother's § 1981 claim based on conduct occurring prior to November 12, 1991, her claims under Article I, § 8 of the California Constitution, and her claims under Cal.Civ. Code §§ 51 and 51.5.[5]

### I. Standard of Review

■ A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo*. *Stone v. Travelers Corp.*, 58 F.3d 434, 436–37 (9th Cir.1995). A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Parks Sch. of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995).

■ A grant of summary judgment is reviewed *de novo*. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1995). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

■ We review the district court's interpretation of state law under the same in-

dependent *de novo* standard that we review questions of federal law. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). "When interpreting state law, federal courts are bound by decisions of the state's highest court. 'In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" *Arizona Elec. Power Coop., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir.1995) (quoting *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990)).

### II. Discrimination Under FEHA

■ Strother challenges the district court's dismissal of her FEHA discrimination claim pursuant to Fed.R.Civ.P. 12(b)(6). Under FEHA, it is unlawful:

For an employer, because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions or privileges of employment.

Cal.Gov't Code § 12940(a) (West Supp.1996). The district court erred in granting the Medical Group's 12(b)(6) motion on Strother's FEHA claim on the ground that Strother, as a bona fide partner in the Medical Group, could not be an employee covered by FEHA.

California authority is of limited assistance in determining whether Strother is protected by FEHA, but does reveal the provision's general purpose. FEHA's broad goal is to forward "the public policy of the state that it is necessary to protect and safeguard the

---

breach of contract, invasion of privacy, and intentional infliction of emotional distress.

**5.** The parties stipulated to the amount of statutory costs to which the Medical Group is entitled as a result of the district court's judgment, but Strother appeals the district court's underlying

finding that the Medical Group was a prevailing party. Thus, because we reverse and remand to the district court on several grounds, we reverse the district court's finding that the Medical Group was the prevailing party.

right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement" on account of race, sex, or other specifically named characteristics. *Rojo v. Kliger,* 52 Cal.3d 65, 276 Cal.Rptr. 130, 133, 801 P.2d 373, 376 (1990) (quoting Cal.Gov't Code § 12920). It is to be "construed liberally." *Robinson v. FEHC,* 2 Cal.4th 226, 5 Cal.Rptr.2d 782, 785, 825 P.2d 767, 770 (1992) (quoting Cal.Gov't Code § 12993(a)). The California Code of Regulations, which governs the affairs of the Fair Employment and Housing Commission, defines "employee" as "[a]ny individual under the direction and control of an employer," and does not explicitly exclude individuals labeled as partners from the definition of employee. Cal.Code Regs. tit. 2, § 7286.5(b) (1995). No California FEHA case has examined whether a "partner" can be characterized as an "employee" entitled to FEHA protection. However, because California courts have interpreted § 12940 in accordance with cases interpreting the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.,*[6] and the federal Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.,*[7] we look to federal cases in those areas that have addressed whether an individual labeled as a partner can be considered an employee for the purpose of employment discrimination laws.

This circuit has not addressed whether an individual labeled a "partner" can be entitled to the protection of federal employment discrimination laws. A number of other circuits and district courts have examined the issue, finding in some cases that a partner was not entitled to the protection of the federal employment discrimination laws, and finding elsewhere that an individual labeled a "partner" was entitled to the same discrimination protection as other employees. In *Fountain v. Metcalf, Zima & Co.,* 925 F.2d 1398 (11th Cir.1991), the Eleventh Circuit held that determining whether an individual was a partner or employee required the court to "look to the particular circumstances of the case at hand" and "focus not on any label, but on the actual role played by the claimant in the operations of the involved entity and the extent to which that role dealt with traditional concepts of management, control, and ownership." *Id.* at 1400–01. The court determined that a member/shareholder of a four-member accounting firm who owned 31% of the firm could not assert an ADEA claim against the firm because he shared in the firm's profits, losses, and expenses; was liable for certain debts and obligations of the firm; and had the right to vote his shares on amendments to the partnership agreement, admission of new members, termination of the agreement, and distribution of profits. *Id.* at 1401. The court found that Fountain's contention that one of the partners ran the firm in an "autocratic" manner was insufficient to avoid summary judgment because domination by one "autocratic" partner over other partners is not uncommon. *Id.*

In *Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), the Tenth Circuit determined that one of 502 partners in a national accounting firm was not an "employee" entitled to the protection of Title VII, ADEA, or the Equal Pay Act. *Id.* at 277. Wheeler's partner benefits and responsibilities were similar to those of the partner in *Fountain,* but she also alleged that she continued to be subject to a great deal of supervision, that the firm was run by an extensive hierarchical structure, and that she made an insignificant contribution to the firm's capital in becoming a partner. *Id.* at 261–62. The court nonetheless held that the "total bundle of partnership characteristics" was sufficient to differentiate Wheeler from employees covered by federal discrimination laws. *Id.* at 276. Despite its finding that Wheeler was not an employee, the court cautioned that in some instances an individual labeled a "partner" might actually be an employee. "The bundle of partnership characteristics we have identified may be lacking

---

**6.** *Breitman v. May Co. California,* 37 F.3d 562, 565 (9th Cir.1994) (citing *Stephens v. Coldwell Banker Commercial Group, Inc.,* 199 Cal.App.3d 1394, 245 Cal.Rptr. 606, 609 (1988)).

**7.** *See, e.g., Carr v. Barnabey's Hotel Corp.,* 23 Cal.App.4th 14, 18, 28 Cal.Rptr.2d 127, 129 (1994); *University of S. Cal. v. Superior Court,* 222 Cal.App.3d 1028, 1035, 272 Cal.Rptr. 264, 268 (1990).

in important particulars, or there may be some deception which compromises the actuality of those characteristics." *Id.* at 277.[8]

Other federal cases have determined that individuals referred to as "partners" were nonetheless entitled to anti-discrimination law protection. In *Simpson v. Ernst & Young,* 850 F.Supp. 648 (S.D.Ohio 1994), the court held that a "partner" in a large national accounting firm was an "employee" entitled to ADEA protection where the plaintiff "lacked any meaningful control and voting rights in Ernst & Young U.S., did not share in the firm's profits and losses, did not enjoy a fiduciary relationship with the Management Committee members, and had no other ownership rights therein." *Id.* at 663. The court also noted that "labeling a person 'partner' does not make him so." *Id.* In *Caruso v. Peat, Marwick, Mitchell & Co.,* 717 F.Supp. 218 (S.D.N.Y.1989), the court denied a large national accounting firm's motion for summary judgment on a "partner's" ADEA claim. The district court found that it was unclear whether the "partner" played any more than a nominal role in management of the partnership, and whether the provision in the partnership agreement calling for a two-thirds vote of the partnership before he could be required to resign gave him any real job security. *Id.* at 221–22. Though the "partner" did receive a portion of Peat Marwick's profits as compensation, his compensation was also based on performance, "much like that of a traditional employee." *Id.* at 222. At trial, the jury determined that Caruso was an "employee" for ADEA purposes. *See Ca-*

*ruso v. Peat, Marwick, Mitchell & Co.,* 779 F.Supp. 332, 333 (S.D.N.Y.1991).[9]

■ The cases discussed above, including those in which the courts found that the "partners" in question were not protected by the federal anti-discrimination laws, reveal that determining whether an individual is an "employee" typically requires a factual inquiry which goes beyond merely the partnership agreement and the "partner" label. Courts must analyze the true relationship among partners, including the method of compensation, the "partner's" responsibility for partnership liabilities, and the management structure and the "partner's" role in that management, to determine if an individual should be treated as a partner or an employee for the purpose of employment discrimination laws.

■ In the case at hand, the district court made a determination that Strother was not an employee based solely on her complaint, the attached partnership agreement, and Strother's "partner" label. Although the Medical Group points to a number of partnership rights provided to Strother in the partnership agreement,[10] the affairs of the "partnership" are conducted predominantly by the Board of Directors, over which she has little control and to which she has limited access. Her compensation is determined to a significant degree by her performance, and she can be disciplined for poor performance. The size of the Medical Group—Strother is one of 2400–2500 "partners"—makes it more likely that Strother could demonstrate that her actual

---

8. *See also E.E.O.C. v. Dowd & Dowd, Ltd.,* 736 F.2d 1177, 1178–79 (7th Cir.1984) (considering "economic realities of the employment relationship" in determining that lawyer-shareholder in professional corporation was not protected by Title VII); *Burke v. Friedman,* 556 F.2d 867, 869 (7th Cir.1977) (partners not "employees" for the purpose of determining whether law firm had enough employees to be covered by Title VII); *Ehrlich v. Howe,* 848 F.Supp. 482, 486–89 (S.D.N.Y.1994) (looking at attorney's "actual duties and status" rather than his title in determining that non-equity partner with 10.7% voting share in seven-partner firm was not an employee entitled to ERISA protection).

9. *Cf. Hyland v. New Haven Radiology Associates,* 794 F.2d 793, 797–98 (2d Cir.1986) (holding that

doctor shareholder in professional corporation was an "employee" entitled to ADEA protection); *Jones v. Baskin, Flaherty, Elliot and Mannino, P.C.,* 670 F.Supp. 597, 601–02 (W.D.Pa.1987) (holding that shareholder attorney in professional corporation was an "employee" entitled to ADEA protection; each shareholder was paid like an employee and the corporation was run by a Board of Directors, of which the plaintiff was not a member).

10. These include the rights to run for election to the Board of Directors, and to vote on proposed amendments to the partnership, Board of Directors representatives, discharges of partners, and termination of the partnership itself.

partnership rights are limited enough that she should be characterized as an employee. The complaint and the partnership agreement leave many unanswered questions about how the partnership actually conducts itself. Although it may ultimately be demonstrated that Strother is not an "employee" entitled to FEHA protection, and resolution of the issue on summary judgment could be appropriate, the district court erred in determining that Strother could plead no set of facts to show that she was actually an "employee" entitled to FEHA protection.[11]

### III. Retaliation Under FEHA

 In granting the Medical Group's motion for summary judgment on Strother's FEHA retaliation claim, the district court held that Strother "failed to show that there is a genuine issue of material fact to support" her claim. To avoid summary judgment on an unlawful retaliation claim, a plaintiff must first produce evidence supporting a *prima facie* case of employment discrimination. After a *prima facie* case is established, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision, and if such a reason is articulated, the plaintiff must demonstrate that the reason given was merely a pretext for a discriminatory motive. *See Lam v. University of Hawai'i,* 40 F.3d 1551, 1559 & n. 11 (9th Cir.1994). Because Strother offered evidence to prove a *prima facie* FEHA retaliation case and proffered sufficient facts so that a reasonable trier of fact could find that the Medical Group's explanation of its actions was merely a pretext for discrimination, we reverse the district court's grant of summary judgment.

 To assert a *prima facie* retaliation claim under FEHA, "the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse em-

ployment action, and there is a causal link between the protected activity and the employer's action." *Flait v. North American Watch Corp.,* 3 Cal.App.4th 467, 476, 4 Cal. Rptr.2d 522, 528 (1992); *see also Moyo v. Gomez,* 40 F.3d 982, 984 (9th Cir.1994) (articulating the same three-pronged requirement for Title VII retaliation claim), *cert. denied,* ––– U.S. –––, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995). If Strother is an "employee" entitled to FEHA protection, as discussed above, her complaint with the California Department of Fair Employment and Housing ("DFEH") about her treatment by the Medical Group was clearly a protected activity that would establish the first element of a *prima facie* retaliation claim. Moreover, even if Strother cannot bring a FEHA *discrimination* claim, she can still assert a FEHA *retaliation* claim if she had a "reasonable" belief that she had a legitimate FEHA claim when she filed her first complaint with the DFEH. *See Flait,* 3 Cal.App.4th at 477, 4 Cal.Rptr.2d at 529 (" '[I]t is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.' ") (quoting *Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179, 1182 (7th Cir.1982)); Cal.Code Regs. tit. 2, § 7287.8(a)(1)(C) (1995) (prohibiting retaliation against an employee for "[o]pposing employment practices which an individual reasonably believes to exist and believes to be in violation of [FEHA]").

In *Moyo,* a black prison guard alleged that he was fired from his job with the California Department of Corrections for protesting against the Department's policy of allowing white inmates to take showers after work shifts, but not allowing the same privilege to black inmates. The Department argued that inmates were not "employees" entitled to the

---

**11.** If the district court determines that Strother is an "employee" of the Medical Group who is entitled to FEHA protection, she may be able to base her claims in part on events occurring outside the FEHA one-year limitations period, Cal. Gov.Code § 12960 (West 1962), because of the "continuing violations" doctrine. *See, e.g., Accardi v. Superior Court,* 17 Cal.App.4th 341, 349,

21 Cal.Rptr.2d 292, 296 (1993) ("Under this doctrine, a complaint arising under FEHA is timely if *any* of the discriminatory practices continues into the limitations period."). We leave it to the district court to determine whether the continuing violations doctrine allows Strother to rely on conduct occurring prior to the relevant FEHA

protection of Title VII. While we were unable to conclude from the record that the inmates were not "employees," we found that such a determination was irrelevant to Moyo's retaliation claim because he could "state a retaliation claim if he could show that his belief that an unlawful employment practice occurred was 'reasonable,'" regardless of the inmates' status as "employees." 40 F.3d at 985. "The reasonableness of Moyo's belief that an unlawful employment practice occurred must be assessed according to an objective standard—one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." *Id.*

■ In the case at bar, there is evidence from which a reasonable factfinder could conclude that Strother had a reasonable belief that she was opposing unlawful employment practices when she filed her complaint with DFEH on September 12, 1991. As discussed above, there is some doubt about whether she is an "employee" protected by FEHA. As *Moyo* makes clear, a complaint about treatment of someone not covered by discrimination laws can nonetheless give rise to a retaliation claim if the complaining party reasonably believed that that person was covered. It follows that an individual who is reasonably mistaken about *her own* coverage by employment discrimination laws may assert a claim for retaliation. There is no evidence that Strother's complaints to DFEH were in any way brought in bad faith or meant to harass the Medical Group. Thus, even if Strother is not an "employee" for the purpose of FEHA, a finder of fact could conclude that she had a "reasonable" belief that a FEHA violation had occurred when she filed her charge with the DFEH, making her action a protected activity.

■ Strother also proffered sufficient facts to establish that she suffered an adverse employment action, the second element of a *prima facie* case. Not every employment decision amounts to an adverse employment action.[12] For example, mere ostracism in the workplace is not enough to show an adverse employment decision. *See Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 615, 262 Cal.Rptr. 842, 856 (1989) (finding that the existence of a hostile work environment could make employer liable for retaliation, but noting that "[o]stracism ... does not amount to a hostile environment"). Here, however, Strother has alleged in her answers to interrogatories that she was replaced as the Coordinator for the "Personal Physician Program," and that she was excluded from educational seminars, meetings, and positions involving quality assurance after her complaint to the DFEH. Under the partnership agreement, these positions may have put her in a position for merit pay increases. Her answers to interrogatories also allege that she was excluded from meetings with nurses and regarding telephone access, that she suffered some verbal and physical abuse at the hands of other doctors, that she has been excluded from Urgent Care meetings, that she has been denied secretarial support, and that she had been given a more burdensome work schedule. These allegations, if proven, would be sufficient to demonstrate an adverse employment decisions.

■ Strother has proffered sufficient facts that could establish the third element of a *prima facie* retaliation case—a causal link between her complaints and the adverse employment decisions. According to Strother's answers to interrogatories, on August 13, 1991, David Bridgeford, the West Covina PIC, told Strother "that he knew that she

limitations date in support of her FEHA discrimination claim.

12. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (questioning existence of "adverse" employment action where employee "was not demoted, or put in a worse job, or given any additional responsibilities"), *cert. denied,* —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987) (no adverse employment decision where temporary transfer did not result in loss of salary or benefits). *But see Dominic v. Consolidated Edison Co. of New York, Inc.,* 822 F.2d 1249, 1254–55 (2d Cir.1987) (employee showed adverse employment decision where he was transferred to area with poor working conditions and deluged with work).

had contacted the EEO people up north and that it would not be in her best interests to file a discrimination charge."[13] Strother was allegedly removed from her position as Coordinator for the Personal Physician Program the day after she filed her first complaint with DFEH on September 12, 1991. Several other alleged acts of retaliation occurred within months afterward.[14] A reasonable factfinder could conclude that the Medical Group's adverse employment decisions were caused by Strother's complaint.

▮ To rebut Strother's *prima facie* case, the Medical Group does not specifically provide legitimate explanations for treatment that supports Strother's *retaliation* claim, focusing instead on providing explanations for its actions which formed the basis of Strother's FEHA *discrimination* claim, events occurring before Strother filed her administrative complaint with DFEH. Even if we accept the reorganization of the Baldwin Park Area and Strother's abrasive personality style as the Medical Group's explanation of its actions after Strother filed her DFEH claim, Strother has produced sufficient evidence so that a reasonable factfinder could find that this explanation was merely a pretext.

▮ Although the mere existence of a *prima facie* case is insufficient to preclude summary judgment, a plaintiff "need produce 'very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext." *Warren*, 58 F.3d at 443 (quoting *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir.1991)). "To survive an employer's summary judgment motion, only a genuine factual issue with regard to discriminatory intent need be shown, a requirement that is almost always satisfied when the plaintiff's evidence, 'direct or circumstantial, consists of more than the [presumption established by the three-pronged *prima facie* case test].'" *Lam*, 40 F.3d at 1559 (quoting *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir.1991)). The same evidence can be used to establish a *prima facie* case *and* to create a genuine issue regarding whether the employer's explanations are pretextual. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.1994).[15]

Though the Medical Group alleges that its decisions were made in part because of Strother's poor interpersonal skills, Strother produced a letter from David Bridgeford, dated November 14, 1990, in which he writes that she was "well respected and literally able to get along in any situation with anyone." Strother also produced a letter, dated June 7, 1991, signed by eleven other physicians containing words to the same effect. While Bridgeford asserts that his letter was untrue and signed with the hope that Strother would leave the West Covina office, the truth of the documents is nonetheless a factual issue based on credibility issues. These letters, along with the temporal proximity of the adverse employment decisions to Strother's complaint to DFEH and Bridgeford's alleged threats to Strother, are sufficient to raise a genuine issue of material fact as to

---

**13.** These alleged threats could be considered actual evidence of the Medical Group's discriminatory motive, which alone would be sufficient to establish a *prima facie* case. *See Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985) ("[A]ny indication of discriminatory motive—including evidence as diverse as '... [defendant's] reaction, if any, to [plaintiff's] legitimate civil rights activities; and [defendant's] general policy and practice with respect to minority employment,'—may suffice to raise a question that can only be resolved by a factfinder.") (alteration in original) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973)), *amended on other grounds*, 784 F.2d 1407 (9th Cir.1986).

**14.** *Cf. Flait*, 3 Cal.App.4th at 478, 4 Cal.Rptr.2d at 529 (sufficient causal link where supervisor who terminated employee had made sexist comments to another employee and fired employee five months after a confrontation); *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir.1989) (sufficient causal link pled where employees were laid off 42 and 59 days after EEOC hearing), *cert. denied*, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

**15.** *See also Sischo–Nownejad*, 934 F.2d at 1112 (holding that direct evidence of discrimination can be "sufficient not only to establish [plaintiff's] *prima facie* case, but also to create a genuine issue of material fact regarding whether the defendants' articulated reasons are pretextual"); *Flait*, 3 Cal.App.4th at 479, 4 Cal.Rptr.2d at 530 ("Pretext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.").

Strother's retaliation claim, even if Strother ultimately cannot bring a FEHA discrimination claim. We reverse the district court's grant of summary judgment for all defendants on Strother's FEHA retaliation claim.

### IV. Article I, § 8 of the California Constitution

 Strother challenges the district court's grant of the Medical Group's motion for summary judgment on her claim brought directly under the California Constitution. Article I, § 8 of the California Constitution reads in full:

> A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

Cal. Const. art. I, § 8 (West 1983). The district court granted summary judgment in favor of the Medical Group on Strother's § 8 claim because she had "not shown that she was denied the ability to enter or pursue her profession," and held that "claims based directly on [§ 8] may not be based on the regulation of particular aspects of plaintiff's work or her duties within that profession." We affirm the district court on the ground that a claim brought directly under Article I, § 8 of the California Constitution may only be brought where a plaintiff has been denied entrance into a profession or particular employment or terminated from the same.

The Medical Group argues that Strother cannot bring a § 8 claim because she was not prevented from pursuing an entire profession, relying on *Long v. California State Personnel Board,* 41 Cal.App.3d 1000, 116 Cal.Rptr. 562 (1974). In *Long,* the California Court of Appeals interpreted the predecessor to § 8, Cal.Const. art. XX, § 18 (repealed 1974), which read: "A person may not be disqualified because of sex, from entering or pursuing a lawful business, vocation, or profession." *Long,* held that a youth detention center's requirement that its chaplains be male did not offend the constitutional provision because the restriction did not entirely prohibit the female petitioner "from pursuing the occupation of minister or chaplain." 41 Cal.App.3d at 1007, 116 Cal.Rptr. at 567.

"In other words article XX section 18 does not prohibit *regulation* of an occupation in such way as to exclude one sex under certain justifiable circumstances; rather it forbids a *prohibition* from the pursuit of that occupation by either sex." *Id.,* 116 Cal.Rptr. at 567. *See also Locker v. Kirby,* 31 Cal.App.3d 520, 526, 107 Cal.Rptr. 446, 451 (1973) (holding that Alcohol Beverage Control rule that prohibited women from serving drinks while topless did not violate Article XX, § 18 because "it did not prevent petitioner . . . from working as a waitress, nor indeed [did] it prevent her from doing so in topless dress so long as no alcoholic beverage license is involved on the premises in question").

 Adopted in 1974, Article I, § 8 extended the protection previously provided by Article XX, § 18 to those discriminated against because of "race, creed, color, or national or ethnic origin" and also prohibits discrimination in "employment." The legislative history of the provision's adoption refers to the statute as a "new Section" designed to prohibit "discrimination in economic opportunities." California Constitution Revision Commission: Proposed Revision of Article I, Article XX, Article XXII of the California Constitution (1971). Case law indicates that § 8 prohibits discrimination that disqualifies an employee from employment with a particular entity, not just disqualification from an entire profession. *See, e.g., Rankins v. Commission on Professional Competence of the Ducor Union Sch. Dist.,* 24 Cal.3d 167, 154 Cal.Rptr. 907, 911, 593 P.2d 852, 856 ("[A]rticle I, section 8 forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship."), *appeal dismissed,* 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979).

Strother argues that § 8 not only prohibits complete disqualification from a particular job or profession, but also provides individuals with a remedy against employers for harassment or disparate treatment in different aspects of a particular job. She relies on *Rojo v. Kliger,* 52 Cal.3d 65, 276 Cal.Rptr. 130, 801 P.2d 373 (1990), in which two female physician's assistants alleged that they were sexually harassed by their employer physi-

cian, who made sexually harassing remarks and demands for sexual favors, and were ultimately forced to leave their employment. In holding that the women could plead a cause of action for wrongful discharge in contravention of public policy, the *Rojo* court relied on § 8 to find a California public policy against sex discrimination. *Id.* 276 Cal.Rptr. at 145–46, 801 P.2d at 388–89. "Regardless of the precise scope of its application, article I, § 8 is declaratory of this state's fundamental public policy against sex discrimination, including sexual harassment, which ... is merely one form of sex discrimination...." *Id.* at 146, 801 P.2d at 389. Continuing its discussion of public policy, but not clearly referring to § 8, the court stated: "No extensive discussion is needed to establish the fundamental *public* interest in a workplace free from the pernicious influence of sexism." *Id.* (emphasis in original). The court concluded that "defendant's discharges of plaintiffs on the grounds alleged contravened a fundamental, substantial public policy embodied in the state Constitution." *Id.*

■ While containing broad language about the § 8 declaration against sexual harassment, *Rojo* was nonetheless a case in which the plaintiffs were claiming wrongful discharge. Indeed, in every case where plaintiffs have brought a claim directly under § 8 or relied on the section to demonstrate a

public policy against sex discrimination, the claimants alleged that they were wrongfully discharged from their employment or threatened with discharge.[16] The plain language of Article I, § 8 indicates that "[a] person may not be *disqualified* ... from entering or pursuing" a particular position.[17] The provision does not use words such as "limited" or "restricted" which might indicate that discrimination in the conditions of employment are likewise prohibited. *Long* indicated that the predecessor to § 8 forbid the prohibition of a person of any sex from pursuing a profession, not *regulation* that excluded members of one sex from a particular position for justifiable reasons. While § 8 has been expanded to protect more classifications of people and to cover "employment," the word "disqualified" remains, indicating that § 8 governs actions which result in the complete exclusion of an individual from employment with a particular employer, and does not reach conduct affecting particular aspects of an individual's job.

The continued use of the word "disqualified" in Article I, § 8 and the fact that all the cases construing § 8 involved plaintiffs who had been terminated, constructively discharged, or threatened with termination leads us to believe that the California Supreme Court would hold that Strother's alle-

**16.** *See, e.g., Rankins,* 154 Cal.Rptr. at 911–12, 593 P.2d at 856–57 (finding that a teacher was wrongfully threatened with discharge for taking religious holidays and holding that "article I, § 8 forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship"); *Badih v. Myers,* 36 Cal.App.4th 1289, 43 Cal.Rptr.2d 229, 232–33 (1995) (holding that a woman terminated because of pregnancy could maintain cause of action for wrongful discharge in contravention of public policy because § 8 prohibits pregnancy discrimination); *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc.,* 3 Cal.App.4th 382, 387, 4 Cal.Rptr.2d 139, 141–42 (1992) (following *Rojo* in finding that plaintiff could bring wrongful discharge claim based on § 8 because of public policy against national origin discrimination); *Carmichael v. Alfano Temporary Personnel,* 233 Cal.App.3d 1126, 1131–1132, 285 Cal. Rptr. 143, 146–47 (1991) (following *Rojo* in finding wrongful termination claim based on policy against racial discrimination in § 8); *see also Merrell v. All Seasons Resorts, Inc.,* 720 F.Supp. 815, 819 (C.D.Cal.1989) (finding private cause of action under § 8 where pregnant woman with

permanent position was offered temporary position with fewer fringe benefits and voluntarily resigned); *Froyd v. Cook,* 681 F.Supp. 669, 673 & n. 11, 676 (E.D.Cal.1988) (former police dispatcher alleging sexual harassment and retaliatory constructive discharge stated claim for discharge in violation of public policy articulated in § 8); *Smithberg v. Merico, Inc.,* 575 F.Supp. 80, 83 (C.D.Cal.1983) (finding that employee who was allegedly discharged for objecting to racial discrimination in the workplace stated claim under § 8).

**17.** Black's Law Dictionary defines "disqualify" as follows:

> To divest or deprive of qualifications; to incapacitate; to render ineligible or unfit, as, in speaking of the "disqualification" of a judge by reason of his interest in the case, of a juror by reason of his holding a fixed preconceived opinion, or of a candidate for public office by reason of non-residence, lack of statutory age, previous commission of crime, etc.

Black's Law Dictionary 472 (6th ed. 1990).

gations of harassment and discriminatory appointments are insufficient to state a claim directly under § 8. The district court properly granted the defendants' motion for summary judgment on Strother's claims under Article I, § 8 of the California Constitution.

## V. The Unruh Act, Cal.Civ.Code § 51

■ Strother alleges that the district court erred in granting the Medical Group's motion for summary judgment on Strother's Unruh Act claim. The relevant portions of the Unruh Act read:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal.Civ.Code § 51 (West Supp.1995). Whether Strother is characterized as an employee or a bona fide partner in the Medical Group, she cannot assert a claim under the Unruh Act for the Medical Group's alleged discrimination.

In *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970), an African–American employee sought damages for wrongful termination under the Unruh Act. The California Supreme Court held that the employee could not recover under the Unruh Act because his employer's discrimination did not constitute discrimination "made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." *Id.* 86 Cal.Rptr. at 92, 468 P.2d at 220. California courts continue to exclude employees from Unruh Act coverage. *See e.g., Rojo,* 276 Cal.Rptr. at 137, 801 P.2d at 380 ("[T]he Unruh Civil Rights Act has no application to employment discrimination.").

In excluding employees from Unruh Act coverage, California courts have recognized that the Act and its predecessors have generally been designed to prevent proprietors of businesses from excluding anyone from frequenting their business because of race, national origin, sex, etc. The early common law prohibited discrimination against members of the public in their use of particularly important public enterprises such as bridges, ferryboats, and inns. *See Warfield v. Peninsula Golf & Country Club,* 10 Cal.4th 594, 42 Cal.Rptr.2d 50, 57, 896 P.2d 776, 783 (1995). Passed in 1897, and amended in 1919 and 1923, the California predecessor to the Unruh Act entitled all citizens of the state to "the full and equal accommodations, advantages, facilities and privileges" of numerous business enterprises. *Id.*[18] In response to holdings that the law did not require "a private cemetery, a dentist's office, and a private school to make their facilities available to African–American patrons," the Unruh Act extended the prohibition on discrimination to "all business establishments" in 1959. *Id.* 42 Cal.Rptr.2d at 58, 896 P.2d at 784.

Decisions subsequent to *Alcorn,* however, have allowed parties that are not "clients, patrons or customers" in the traditional sense to bring Unruh Act claims. For example, in *Isbister v. Boys' Club of Santa Cruz, Inc.,* 40 Cal.3d 72, 219 Cal.Rptr. 150, 707 P.2d 212 (1985), the California Supreme Court found that the nonprofit Boys' Club, which operated a community recreation center, violated the Unruh Act by enforcing a male-only membership policy. *Id.* 219 Cal. Rptr. at 153–63, 707 P.2d at 215–25. Interpreting its earlier statement in *Alcorn,* quoted above, the court explained that "[i]n context, the statement meant only that the *employer-employee* relationship was not covered by the Act, which was confined to discriminations against recipients of the 'business establishment's ... goods, services or facilities.' Discrimination in services and facilities is precisely what is alleged here." *Id.* at 157 n. 12, 707 P.2d at 219 n. 12.

In *O'Connor v. Village Green Owners Ass'n,* 33 Cal.3d 790, 191 Cal.Rptr. 320, 662 P.2d 427 (1983), the California Supreme

18. The statute specifically forbid discrimination by "inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement." 1923 Cal.Stat. ch. 235, § 1.

Court held that condominium owners could bring an Unruh Act claim against the owners' association for its attempt to prevent the condominium owners from living in the complex with their infant son, in violation of the covenants, conditions, and restrictions on the complex. *Id.* 191 Cal.Rptr. at 324–25, 662 P.2d at 431. While the owners' association attempted to characterize itself as little more than an organization that "mows lawns" for its members, the court noted that the association employed a property management firm, insured the property, repaired and maintained common areas, collected assessments from residences, and adopted and enforced rules for the residents. "In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders." *Id.*

In *Jackson v. Superior Court,* 30 Cal. App.4th 936, 36 Cal.Rptr.2d 207 (1994), an African–American investment advisor, who accompanied two of his clients to a bank so that they could purchase a mutual fund, alleged that the bank manager told his clients that he was trying to scam them, called the police to investigate him, and verbally attacked Jackson until he and his clients were forced to leave. Jackson sued the bank, alleging, *inter alia,* a violation of the Unruh Act. Although Jackson himself was not a "customer" of the bank, the court of appeals noted:

> The bank accommodates the public in many ways peripheral to its main functions of providing banking services. For example, a bank ordinarily allows persons to accompany its customers and help them pursue their banking business. When it refuses to allow an African American this courtesy because of his or her race, the bank denies that person the "full and equal accommodations, advantages, privileges or services" of the bank.

*Id.* at 941, 36 Cal.Rptr.2d at 208–09. Thus, Jackson could bring an Unruh Act claim.

In *Rotary Club of Duarte v. Board of Directors,* 178 Cal.App.3d 1035, 224 Cal.Rptr. 213 (1986), *aff'd* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), the California Court of Appeals ruled that the national Rotary Club organization's attempt to expel a local chapter for admitting female members violated the Unruh Act. The court found that membership in the Rotary Club was "clearly an 'advantage' or 'privilege' under the Unruh Act," because of the numerous business advantages available through contacts with other members of the Club. 178 Cal.App.3d at 1059, 224 Cal.Rptr. at 227.

The cases described above have found that Unruh Act claims were appropriate where the plaintiff was in a relationship with the offending organization similar to that of the customer in the customer-proprietor relationship which the Act and its predecessors have most commonly covered. The plaintiffs in *Isbister* and *O'Connor* were involved in relationships substantially similar to those of health club owner-patron and landlord-tenant respectively. The plaintiff in *Jackson,* though not himself a customer, was allegedly denied access to the facilities of the bank which would have been available to someone of a different race. The substantial business benefits received by members in *Rotary Club* are similar to benefits received by patrons of dinner clubs or other business establishments where business is created.

Strother argues that she is protected by the Unruh Act because in her position at the Medical Group she is "entitled to receive economic benefits, the use of certain medical facilities, medical supplies and other goods, management courses, and a variety of privileges, advantages, and services, including opportunities for promotion and advancement." These benefits, however, are no different than those that would be received by any doctor who was, as she once was, a mere employee of the Medical Group. Being a "recipient" of these benefits does not entitle Strother to the protection of the Unruh Act any more than an employee's being the "recipient" of a paycheck gives him or her Unruh Act protection. Even if Strother were considered a bona fide partner rather than an "employee" for the purpose of FEHA, her relationship to the Medical Group is more like that of an employee than that of a "client, patron or customer." The district court properly granted the Medical Group's

motion for summary judgment on Strother's Unruh Act claims.

### VI. Cal.Civ.Code § 51.5

■ Strother likewise argues that the district court erred in dismissing her claim under Cal.Civ.Code § 51.5 on the grounds that she was not a "customer, client, or patron" of the Medical Group. Section 51.5 of the California Civil Code reads in relevant part:

No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, refuse to buy from, sell to, or trade with any person in this state because of the race, creed, religion, color, national origin, sex, or disability of the person....

Cal.Civ.Code § 51.5 (West Supp.1996).

Few California cases have construed this provision, originally passed in 1976. On its face, § 51.5, like § 51, appears to be aimed only at discrimination in relationships similar to the proprietor/customer relationship. All the forbidden acts referred to except "discriminate" expressly refer to transactions of a proprietor/customer sort. Indeed, at least one California court has noted that § 51.5 is an expansion upon § 51. *See Roth v. Rhodes*, 25 Cal.App.4th 530, 537, 30 Cal. Rptr.2d 706, 709 (1994) ("Section 51.5 expands on section 51 by, inter alia, specifying forms of discrimination, including refusal to deal."). *Roth* refers to the Unruh Act as "§ 51 et seq." rather than simply as "§ 51," *id.*, 30 Cal.Rptr.2d at 709, and §§ 51 and 51.5 share the same penalty provision. *See* Cal. Civ.Code § 52(a) (West Supp.1996).[19] Interpreting this provision consistently with § 51, we hold that Strother, as either a partner or employee, cannot bring a claim under § 51.5. The district court properly granted the defendants' motion for summary judgment on Strother's claim under Cal.Civ.Code § 51.5.

### VII. 42 U.S.C. § 1981

■ Strother argues that the district court erred in granting the Medical Group's motion for summary judgment on her claims

under 42 U.S.C. § 1981. Section 1981 currently reads in relevant part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981 (Supp. IV 1992). Subsection (b) of the provision was added by the Civil Rights Act of 1991 ("CRA 1991"). Claims arising out of acts occurring prior to the enactment of CRA 1991 on November 12, 1991, are governed by § 1981 as it was interpreted by the Supreme Court prior to its amendment. *Rivers v. Roadway Express, Inc.*, —— U.S. ——, ——, 114 S.Ct. 1510, 1519–20, 128 L.Ed.2d 274 (1994) (holding that because CRA 1991 did not clearly indicate retroactive effect, and because it "creates liabilities that had no legal existence before [it] was passed, [it] does not apply to pre-enactment conduct.")

■ Under *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), employees can bring a claim under § 1981 for acts occurring prior to the enactment of CRA 1991 only if they allege discrimination in the *formation* of an employment contract, as opposed to claims based on discrimination while they are working in a particular position or discriminatory termination. *Id.* at 176–78, 109 S.Ct. at 2372–73. We hold that none of the Medical Group's treatment of Strother or the alleged denial of promotions prior to November 12, 1991, the date of CRA 1991's enactment, gives rise to a § 1981 claim because none of the conduct amounted to discrimination in contract *formation.* However, because the district court failed to consider Strother's allegations of discriminatory treatment occurring after the passage of CRA 1991 on

---

**19.** *See also Pines v. Tomson*, 160 Cal.App.3d 370, 384, 206 Cal.Rptr. 866, 874 (1984) (holding that "business establishment of every kind whatsoever" has the same meaning under § 51 and § 51.5).

November 12, 1991, we remand for a determination of whether Strother has presented a triable claim under revised 42 U.S.C. § 1981.

### A. Strother's Pre–November 12, 1991 Promotion Denials

██ For denials of promotions prior to November 12, 1991, "[o]nly where the [denied] promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." *Patterson*, 491 U.S. at 185, 109 S.Ct. at 2377. The Court cited *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), a Title VII case in which a law firm associate alleged that she was not accepted as a partner because of her sex, as an example of such a new and distinct relationship.

██ In *Patterson*, an African–American woman employed at a credit union as a teller and file coordinator, brought a racial harassment and wrongful termination claim under § 1981. Some of her complaints were that "[her supervisor] gave her too many tasks, causing her to complain that she was under too much pressure; that among the tasks given her were sweeping and dusting, jobs not given to white employees; . . . [and that her supervisor] criticized her in staff meetings while not similarly criticizing white employees." *Id.* at 178, 109 S.Ct. at 2373. She also alleged "that she was passed over for promotion, not offered training for higher level jobs, and denied wage increases, all because of her race." *Id.* The Court found that with the possible exception of one particular denied promotion,[20] none of these allegations constituted "either a refusal to make a contract with her or the impairment of her ability to enforce her established contract rights." *Id.* at 179, 109 S.Ct. at 2374. It is clear from *Patterson* that none of Strother's pre-November 12, 1991 harassment claims not involving the Medical Group's denial of promotions and appointments can support a § 1981 claim.

This Circuit has examined several claims alleging discrimination in denied promotions to determine whether they would have constituted a sufficient change in the employment relationship to give rise to a § 1981 claim. In *Sitgraves v. Allied–Signal, Inc.*, 953 F.2d 570 (9th Cir.1992), we found that "a simple change in position from supervised employee to supervisor is one that alters the contractual relationship sufficiently to fall within the purview of section 1981 protection even after *Patterson*," and that the promotion need not be to a top policymaking position. *Id.* at 574. We also concluded "that the move from compensation based on hours worked to compensation based on an annual salary constitutes a sufficiently new and different contractual relationship to provide an actionable promotion claim." *Id.* We thus found that three employees who sought promotions from hourly-compensated, non-supervisory positions to a supervisory, salaried positions stated § 1981 claims. In contrast, two employees who merely sought promotion to more skilled positions with higher pay did not state claims because their current and desired positions were both non-supervisory and hourly-compensated. *Id.* We remanded for further factual findings regarding a sixth employee because we could not determine from the record whether the employee's denied promotion would have changed his position from supervised to supervisor, or merely moved him from one supervisory position to another, and "whether a change in the nature of his supervisory functions would have significantly altered the nature of his relationship to management." *Id.*; *see also Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1494 (9th Cir.1995) (holding that a laundry worker could not assert § 1981 claim for a refused transfer to two accounting positions, because both were non-supervisory and compensated hourly, but could assert a claim for a refused transfer to a purchasing and receiving position that would have included supervisory duties); *Rodriguez v. General Motors Corp.*, 27 F.3d

**20.** The Court noted that the only possible claim that Patterson could have under § 1981 would be for the credit union's failure to promote her to a position as an intermediate accounting clerk in another department, but declined to consider

whether that would be a sufficient change in the employee-employer relationship because the credit union had not challenged Patterson's right to bring a § 1981 claim for that failure to promote. *Id.* at 184–86, 109 S.Ct. at 2377.

396, 399–400 (9th Cir.1994) (employee not entitled to bring § 1981 claim where current job and job sought both involved supervision of other employees, both positions reported to same supervisor, new job would not entail significant new duties, and employee did not show that there would be an increase in pay).

We can easily dispose of Strother's claims that the Medical Group's failure to appoint her to handle physician recruitment, failure to hire her as Quality Assurance coordinator, and failure to appoint her to the Urgent Care Committee are actionable under § 1981. Even assuming that holding more positions within the Medical Group would entitle Strother to merit pay increases, this potential increase in pay alone is not enough to claim a violation of § 1981. Though Strother would have "supervised" certain aspects of the functioning of the Medical Group in these positions, none of them would have placed her in a position as superior to any of her partners or changed her relationship with the partnership; she would continue to be an ordinary partner, performing more duties.

Strother's claims that she was denied PIC positions at two other Medical Group clinics and denied a position as a Module Lead at the West Covina clinic demand closer examination. Strother states in her complaint that a PIC "acts as a manager or supervisor for defendant Medical Group and a supervisor and administrative superior of [other partners]." For its part, the Medical Group contends that the duties of the PIC have declined with the reorganization of the Medical Group, and have been spread more evenly among other physicians. The Partnership Agreement indicates that the PIC is appointed for a six-year term of office, that appointments are made by the Area Associate Medical Director and may be made with the advice of partners in a particular area, and that PICs may be reappointed at the expiration of their term. PIC's are given an additional stipend of $200–$500 a month.[21]

Neither the additional income that Strother would receive as a PIC or might receive as a Module Lead, nor the additional duties that Strother would acquire in either position would significantly alter Strother's contractual relationship with "management." The additional stipend for the PIC does not constitute a fundamental change in the way the doctor is compensated and does not indicate a change in her contractual relationship with the Medical Group. *See Sitgraves*, 953 F.2d at 574. While *Sitgraves* indicates that a denied change "from supervised employee to supervisor" would give rise to a § 1981 claim, and *Patterson* indicates that the same would be true for a denial of a partnership position to an employee, Strother's appointment to PIC or Module Lead would not be such a fundamental change in the relationship between Strother and the Medical Group. In a partnership like the Medical Group, "management" is the partnership itself, even though individuals and committees are appointed to conduct certain aspects of the partnership's affairs. Like the employee in *Rodriguez*, Strother, who had already "supervised" other doctors to some extent as APIC and in other administrative positions, would merely gain additional supervisory responsibilities if appointed PIC or Module Lead. An appointment to PIC or Module Lead would not have altered the contractual relationship between Strother and her partners sufficiently to give her a § 1981 claim under *Patterson*.[22]

### B. Discrimination Claims After November 12, 1991

In ruling on Strother's § 1981 claim, the district court based its decision entirely on

---

**21.** The duties of a Module Lead physician are more limited. The record reveals that there are several modules within each clinic, consisting of three to six physicians and supporting nurses. Each module has a Module Lead physician who is to "act as a role model and oversee the quality of the service provided within the module." April 18, 1994 Lulejian Decl. ¶ 5. The modules were apparently designed to make the administrative structure more "horizontal," *id.*, and perhaps to eliminate the necessity of having a PIC. May 2, 1994 Lulejian Decl. ¶ 11.

**22.** In light of our holding that none of the alleged conduct of the Medical Group or the other defendants prior to November 12, 1991, gives rise to a § 1981 claim, we need not address the Medical Group's contention that Strother's claims, insofar as they are based on actions occurring prior to September 15, 1991, are barred by the statute of limitations.

*Patterson* and the statute of limitations. The court did not address whether any of Strother's allegations of discrimination by the Medical Group after November 12, 1991, were sufficient to present a triable claim under revised 42 U.S.C. § 1981.

CRA 1991 expanded § 1981 to provide protection for employees in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (Supp.IV 1992). Strother has made numerous factual allegations concerning discrimination on the part of the Medical Group since November 12, 1991, including exclusion from Urgent Care Committee meetings, denial of appointment to the Quality Assurance Committee, and alleged ongoing harassment since May 1991, including the setting of heightened performance standards, the denial of secretarial support, and an increased workload. These allegations are relevant to Strother's claims of discrimination in the enforcement of the partnership agreement. We remand to the district court for a determination of whether Strother's allegations of post-November 12, 1991, conduct present a triable claim under the revised 42 U.S.C. § 1981.

### CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of the Medical Group's 12(b)(6) motion on the FEHA discrimination claim, the motion for summary judgment on the FEHA retaliation claim, and remand on Strother's claim under revised 42 U.S.C. § 1981 insofar as it is based on events occurring after November 12, 1991. We AFFIRM the district court's grant of summary judgment on the claims under the California Constitution, the Unruh Act, and Cal.Civ.Code § 51.5, and Strother's § 1981 claim insofar as it is based on actions of the Medical Group occurring prior to November 12, 1991. Each side is to bear its own costs on appeal.