[No. G032799. Fourth Dist., Div. Three. May 31, 2005.]

DAVID H. PAYNE, Plaintiff and Appellant, v.
ANAHEIM MEMORIAL MEDICAL CENTER, INC., Defendant and
Respondent.

732

COUNSEL

Robert C. Moest for Plaintiff and Appellant.

McDermott Will & Emery, Richard J. Frey and Dan Chammas for Defendant and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—The doctrine requiring exhaustion of internal remedies before resort to the courts is sound and wise—where such remedies are adequate. Sometimes, however, they are not. Where, as here, the "internal remedies" included no requirement of a hearing or formal resolution of the complaints raised, they cannot bar access to the courts.

Anaheim Memorial Medical Center, Inc. obtained a judgment on the pleadings against David H. Payne, M.D., on the basis his complaint was barred by his failure to exhaust administrative remedies contained in the hospital's medical staff bylaws. We conclude that the grievance procedure contained in Article X of the bylaws, which provided Payne with no right to a hearing and no opportunity to provide evidence, did not constitute an adequate "remedy" to resolve his complaint. Consequently, he was not required to "exhaust" that process prior to filing a lawsuit in court.

Additionally, we conclude Payne pleaded sufficient facts to state a valid cause of action pursuant to the Unruh Civil Rights Act (Civ. Code, § 51; UCRA). He

specifically alleged that Anaheim Memorial operates the hospital as a business enterprise which offers its facilities to qualified physicians, who are not its employees, in exchange for fees and other considerations. The UCRA applies to prevent business entities from discriminating in the provision of their facilities on the basis of race, so Payne's allegation he was denied such access is properly cognizable under the UCRA. The judgment is reversed.

* * *

Because the judgment in this case follows a successful motion for judgment on the pleadings, we take our facts from the allegations of the complaint, which we assume to be true. (*Leko v. Cornerstone Bldg. Inspection Service* (2001) 86 Cal.App.4th 1109, 1114 [103 Cal.Rptr.2d 858].) Payne, an African-American, alleges that in August of 2000, certain members of Anaheim Memorial's surgical staff and other employees interfered with his treatment of an elderly Hispanic patient during a spinal surgery—exposing the patient to added surgical risk—for the purpose of demonstrating to him that he "was not welcome within the business environment of [the hospital]." When he later became concerned the patient had developed a dangerous complication, he requested that a myelogram be performed to assess the problem.

However, Dr. Neil Siegel, a radiologist with no experience in spinal surgery, refused to perform the myelogram, insisting it was unnecessary. Payne reminded Siegel that the hospital's radiology department had also refused to perform a myelogram on another of his Hispanic patients, and inquired whether the hospital had a policy of providing a lesser standard of care to its minority patients. Siegel responded "Only someone like you would think of something like that," which Payne understood to be a slur referencing his African-American heritage.

Payne reported the perceived slur to the chief of radiology, who dismissed it as "a mere personality conflict" and advised Payne he could take it up with the chief of the medical staff. Before Payne had a chance to do so, however, the chief of the medical staff ordered him to report to a "Physician Well-Being Committee" for the purpose of explaining his own alleged "unprofessional behavior in the operating room" and his "slander" of Siegel. According to the complaint, this was done for the purpose of covering up Siegel's racist comment and to prevent Payne from further inquiring into the quality of care the hospital afforded him or its patients.

Meanwhile, Payne continued to insist his patient receive a diagnostic test to assess her condition. A different radiologist finally performed a magnetic resonance imaging scan (MRI) of the patient's spine, which was then

interpreted as showing the patient suffered from a "substantial dural leak," requiring immediate repair. Based upon that information from the radiology department, Payne took his patient back into surgery, only to discover no such leak actually existed. Had the more effective myelogram been performed, as Payne originally requested, the second surgery would have been avoided.

Despite the fact that Payne had neither performed, nor interpreted the result of, the MRI that purportedly evidenced the dural leak, Anaheim Memorial's "Medical Executive Committee" assigned responsibility for the unnecessary second surgery to Payne, rather than to the radiologist who had made the diagnosis. The complaint alleges that a "Surgical Ad-Hoc Committee" met in secret, without notice to Payne, and without affording him an opportunity to be heard, to evaluate the case.

Payne alleged that as a result of the committee's determination, his ability to practice medicine at another hospital was specifically restricted, when that hospital imposed a monitoring requirement upon him. He did not allege that any formal restrictions or conditions were placed upon his staff privileges at Anaheim Memorial itself.

Payne also alleged he had subsequent discussions with the chief of the medical staff, and his attorney communicated with Anaheim Memorial's attorney, concerning his allegations of racist conduct. Both were assured that a thorough and independent investigation would be conducted by an outside party, and that Payne would be given a copy of the investigator's findings. However, although the hospital had an attorney investigate the matter, Anaheim Memorial refused to deliver a copy of her report to Payne. Instead, it advised Payne that administrative proceedings would be "forthcoming." Despite that statement, nothing further was done; instead, according to the complaint, the incident was covered up.

After Payne filed this lawsuit, alleging causes of action for violation of the UCRA, and for emotional distress, Anaheim Memorial filed a motion for judgment on the pleadings, arguing Payne had failed to exhaust his administrative remedies under the medical staff bylaws and lacked standing to pursue a claim under the UCRA because he was not a "customer, client or patron" of the hospital.

Quoting from the preamble to its medical staff bylaws, Anaheim Memorial pointed out that they were intended to provide a " 'framework for self-government for the organization of the Medical Staff of [Anaheim Memorial], that permits the Medical Staff to discharge its responsibilities in matters involving the quality of medical care, to govern the orderly resolution of issues and the conduct of Medical Staff functions supportive of those

purposes.' " Anaheim Memorial then noted that under the bylaws, Payne had the right to initiate a complaint against any other physician he believed was acting in a fashion detrimental to patient safety, and that once he had done so, a committee of the medical staff would be charged with investigating the matter. Additionally, any physician had the right to an audience with the Medical Executive Committee, as well as an express duty to "actively participate in and regularly cooperate with the Medical Staff in assisting the Hospital to fulfill its obligations related to patient care."

According to Anaheim's argument, Payne failed to fully avail himself of the remedies available to him under the medical staff bylaws, and was thus precluded from asserting any claim for damages in court in accordance with the doctrine set forth in *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410]. It further contended that even if Payne had exhausted his options under the medical staff bylaws, he was nonetheless precluded from suing for damages until he had successfully challenged the result of the administrative proceeding by way of a writ of mandate. Finally, Anaheim Memorial argued that Payne was not, in any event, entitled to relief pursuant to the UCRA, because his relationship with the hospital was not that of a "customer, client or patron."

Anaheim Memorial attached a copy of its medical staff bylaws to its motion, and those bylaws do contain extensive procedures for internal hearings and appeal in the event of certain adverse actions taken against a physician's privileges to practice at the hospital. Section 9.7 provides that "[a]ny Practitioner has a right to a hearing/appeal and pursuant to the Hospital's fair hearing plan as set forth in Article X[1] of these Bylaws in the event any of the following actions are taken or recommended: [¶] A. denial of initial Staff appointment for a medical disciplinary cause or reason; [¶] B. denial of reappointment for a medical disciplinary cause or reason; [¶] C. revocation of Staff appointment for a medical disciplinary cause or reason; [¶] D. denial or restriction of requested clinical privileges for a medical disciplinary cause or reason; [¶] E. reduction in clinical privileges for a medical disciplinary cause or reason; [¶] F. revocation of clinical privileges for a medical disciplinary cause or reason; [¶] G. suspension of staff appointment or clinical privileges if such summary suspension remains in effect for more than 14 days. [¶] H. suspension of Clinical privileges or Medical Staff membership for a cumulative total of thirty (30) days or more for any twelve (12) month period for a medical disciplinary cause or reason."

Moreover, section 10.1.1 of the bylaws provides that any staff member can initiate a request for corrective action against any other member "[w]henever the activities or professional conduct which includes harassment . . . , of any

---

[1] See footnote 4, *post*.

practitioner with clinical privileges are detrimental to patient safety or to the delivery of high quality patient care, or are considered to be lower than the standards or aims of the Medical Staff, or are disruptive to Hospital operations . . . ."

Section 10.1.2 of the bylaws states that such requests for corrective action are to be submitted in writing to the Medical Executive Committee, after which "the Chief of Staff shall appoint an Ad Hoc Committee to investigate the matter." (Section 10.1.3.) The ad hoc committee may—but is not required to—informally interview the physician against whom the claim is made, and at the conclusion of its investigation "shall forward a written report of its investigation to the Medical Executive Committee, as soon as practicable." Section 10.1.3 specifically states that if the ad hoc committee does choose to interview the subject physician, "such interviews shall not be conducted as a hearing nor shall it constitute a hearing as referred to in Article X [*sic*, presumably Article XI], of the Medical Staff Bylaws."[2]

The Medical Executive Committee itself may also informally interview the subject physician, but is not required to, and the complaining physician has no right to be heard. Section 10.1.3 of the bylaws specifically states the executive committee "may, but is not obligated to interview persons involved." It then goes on to state that if the executive committee does choose to interview anyone, the process "shall not constitute a hearing as that term is used in Article X [*sic*, presumably Article XI] of the Medical Staff Bylaws."

The Medical Executive Committee is then empowered by section 10.1.4 of the bylaws to do any of an array of things, from "Determin[ing] that no corrective action be taken" to "Recommend[ing] suspension, revocation or probation of Medical Staff membership." It is not required to issue a written report, nor is it apparently required to explain its action, unless that action "constitutes grounds for a hearing as set forth in [Article XI] of the Medical Staff Bylaws." (Section 10.1.5(A).)[3] In that case, "the Chief of Staff shall give the [subject] Practitioner written notice of the adverse recommendation and of his/her right to request a hearing in the manner specified in [Article XI.]" (Section 10.1.5(B).) If that occurs, the recommendation will not be acted upon until "the Member has either *exhausted his internal administrative*

---

[2] Article XI of the bylaws, entitled "Hearing and Appellate Review," actually contains all of the procedures governing the initiation and conduct of a hearing after the Medical Executive Committee has recommended denial, restriction, or revocation of a practitioner's medical staff privileges, as well as the procedures for appealing any adverse decision to the board of directors.

[3] The bylaws are somewhat confused at this point, apparently to the failure to renumber the cross-references after the addition of a new article somewhere earlier in the document. We presume the cross-references within article X, referring to the hearing rights in "Article X" are intended to refer to the hearing procedures contained in article XI.

*remedies or waived his/her right to a hearing.*" (Section 10.1.5.(B)(1).) (Italics added.)

On the other hand, "[i]f the Medical Executive Committee rejects the request for corrective action or only a letter of admonition or reprimand or a warning is issued, the decision shall be transmitted to the Board of Directors for its approval. Under these circumstances, the Practitioner shall not be entitled to the procedural rights provided in [Article IX] of the Medical Staff Bylaws." (Section 10.1.5(B)(2).)

Payne opposed Anaheim Memorial's motion for judgment, pointing out that he had actually availed himself of every option for complaint available to him under the medical staff bylaws, and simply had his complaints ignored as part of what he asserted was a cover up. The quasi-judicial hearing and appeal remedy outlined in article XI of the medical staff bylaws was available only to a practitioner whose hospital privileges had been formally *denied, restricted or revoked*, but not to one who had merely been wrongfully discriminated against in a manner short of formal discipline; nor was there any procedural remedy available to a practitioner who felt his complaints about another member of the medical staff were being improperly dismissed. Payne argued the doctrine established in *Westlake Community Hosp. v. Superior Court, supra*, 17 Cal.3d 465, governed only situations in which a physician was subject to some formal discipline, such as restriction or revocation of staff privileges, and for which the medical staff bylaws afforded a specific quasi-judicial remedy, which was not the case here. He also argued that the UCRA was applicable to essentially any relationship other than that of employer and employee, and that it was properly construed to guarantee Payne equal access with other physicians to the hospital's facilities.

The court granted the motion for judgment, explaining: "Defendant's motion for judgment on the pleadings re: plaintiff's first amended complaint is *granted* with leave to amend within 20 days because the defendant's by laws (judicially noticed) require plaintiff to exhaust his administrative remedies prior to bringing an action such as this. There are no allegations in the first amended complaint on this point. Also, it appears that plaintiff may not have standing here to assert a claim under CC section 51."

Payne elected not to further amend his complaint, and filed this appeal instead.

## I

In *Westlake Community Hosp. v. Superior Court, supra*, 17 Cal.3d 465, the case primarily relied upon by Anaheim Memorial, the court held two things:

(1) "that before a doctor may initiate litigation challenging the propriety of a hospital's denial or withdrawal of privileges, he must exhaust the available internal remedies afforded by the hospital"; and (2) "that whenever a hospital, pursuant to a quasi-judicial proceeding, reaches a decision to deny staff privileges, an aggrieved doctor must first succeed in setting aside the quasi-judicial decision in a mandamus action before he may institute a tort action for damages." (*Id.* at p. 469.)

*Westlake* does not, however, stand for the proposition that every grievance option set forth within medical staff bylaws constitutes an "internal remedy" sufficient to resolve a dispute, nor does it provide that every disposition of such a dispute constitutes a "quasi-judicial" proceeding. To the contrary, in *Westlake*, the plaintiff physician sought damages against two different hospitals—Westlake, which had revoked her privileges, and Los Robles, which had rejected her application for privileges. The Supreme Court concluded that while the plaintiff was required to exhaust the internal remedy offered by Westlake prior to filing any claim in court, the plaintiff *could* maintain an action against Los Robles for damages. The court explained that Los Robles's bylaws did not appear to afford the plaintiff any administrative remedy to contest the *denial* of her application for privileges; its bylaws accorded hearing rights only to staff *"members."*[4]

The *Westlake* decision also rejected Los Robles's contention that the plaintiff was nonetheless required to challenge the hospital's denial of her privileges by way of a writ of mandate, prior to filing any suit for damages in court. The court explained that no mandate procedure was required, because "[p]laintiff's exclusion at Los Robles however, was not undertaken pursuant to a quasi-judicial proceeding; the hospital did not inform plaintiff of the reason for her exclusion nor did it notify her of a right to respond to the charges against her." (*Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d at p. 478.)

In this case, Anaheim Memorial was in the same position as was Los Robles in *Westlake*. Los Robles had bylaws which set forth the administrative procedures by which it reached certain decisions, and provided a quasi-judicial administrative remedy (including a formal hearing process) to those disappointed by certain of those decisions. But it did not provide that quasi-judicial remedy with respect to all decisions it made, including its denial of the plaintiff's application for privileges.

---

[4] Of similar effect is *Martino v. Concord Community Hosp. Dist.* (1965) 233 Cal.App.2d 51, 56 [43 Cal.Rptr. 255]). In that case, the court rejected a contention that the physician failed to exhaust administrative remedies because the hearing procedure provided in the hospital's bylaws applied to situations where an application for staff privileges was "rejected or denied," but not merely "deferred."

Similarly, Anaheim Memorial's medical staff bylaws entitle its medical staff to make certain decisions in accordance with internal procedures. However, only certain of those decisions are subject to being challenged internally through a quasi-judicial process. What happened to Payne was not one of those decisions. Because his privileges were not formally impacted, he had no right to any administrative hearing process to air his grievances.

Payne had only the right to complain about Dr. Siegel's comment, and about his general perception that hospital personnel were discriminating against him (and his patients) based upon racial considerations. He did so, both directly and through his attorney. However, once he had done so, the medical staff bylaws guaranteed him nothing more. He had no right to compel anyone to take his assertions seriously, let alone to examine them in the context of a quasi-judicial proceeding.

■ Both an "internal" remedy established by a private organization, and an "administrative" remedy, traditionally provided by statute,[5] are alternatives to an action on the merits of a claim in court,[6] and must include a fair right to

---

[5] The cases involving internal decisionmaking relating to hospital staff privileges are something of a hybrid. Although most decisions are made in accordance with internal "bylaws," those bylaws are subject to specific statutory requirements. (Bus. & Prof. Code, § 805 et seq.) As explained in *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 617 [113 Cal.Rptr.2d 309], "The statutory scheme delegates to the private sector the responsibility to provide fairly conducted peer review in accordance with due process, including notice, discovery and hearing rights, all specified in the statute. (*Shacket v. Osteopathic Medical Board* (1996) 51 Cal.App.4th 223, 231 [58 Cal.Rptr.2d 715]; see §§ 809 to 809.8.) . . . To comply with the statute's mandate, the hospital's medical staff must adopt bylaws that include formal procedures for ' "the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate." [Citation.]' (*Oliver v. Board of Trustees* [(1986)] 181 Cal.App.3d [824,] 827 [227 Cal.Rptr. 1].) It is these bylaws that govern the parties' administrative rights. (*Joel v. Valley Surgical Center* (1998) 68 Cal.App.4th 360, 365 [80 Cal.Rptr.2d 247])."

The terms "internal remedy" and "administrative remedy" are both used in the medical staff cases. (*Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 829 [140 Cal.Rptr. 442, 567 P.2d 1162] [administrative]; *Martino v. Concord Community Hosp. Dist., supra,* 233 Cal.App.2d 51, 56 [administrative]; *Bollengier v. Doctors Medical Center* (1990) 222 Cal.App.3d 1115, 1123 [272 Cal.Rptr. 273] [administrative]; *Joel v. Valley Surgical Center, supra,* 68 Cal.App.4th 360, 365 [administrative]; *Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d 465, 485 [internal]; *Haller v. Burbank Community Hospital Foundation* (1983) 149 Cal.App.3d 650, 656 [197 Cal.Rptr. 45] [administrative or internal]; *Volpicelli v. Jared Sydney Torrance Memorial Hosp.* (1980) 109 Cal.App.3d 242, 254 [167 Cal.Rptr. 610] [administrative].)

[6] As explained in *Rojo v. Kliger* (1990) 52 Cal.3d 65, 85 [276 Cal.Rptr. 130, 801 P.2d 373], " 'The administrative tribunal is created by law to adjudicate the issue sought to be presented to the court. The claim or "cause of action" is within the special jurisdiction of the administrative tribunal, and the courts may act only to *review* the final administrative determination. If a court allowed a suit to be maintained prior to such final determination, it

be heard on an issue and to have a decision rendered through a fair and sufficient process.

With respect to internal remedies provided by private organizations, *Mooney v. Bartenders Union Local No. 284* (1957) 48 Cal.2d 841, 843–844 [313 P.2d 857], explains: "Provisions in union constitutions requiring the exhaustion of internal remedies are generally recognized by the courts as binding on the members. (*Holderby v. International Union etc. Engrs.*[, *supra,*] 45 Cal.2d 843, 846; *Lawson v. Hewell* [(1897)] 118 Cal. 613, 618–619 [50 P. 763].) This rule, however, is subject to certain exceptions. Thus *the internal procedure must be such as will afford an accused member substantial justice,* and further pursuit of internal relief is excused when a union violates its rules for review or when invocation of those rules would be futile." (Italics added.)

■ With respect to statutory remedies, *Jacobs v. State Bd. of Optometry* (1978) 81 Cal.App.3d 1022, 1029 [147 Cal.Rptr. 225], states "The rule relative to exhaustion of administrative remedies as a prerequisite to a civil action at law is premised upon the existence of a specific administrative remedy provided by statute. (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292–293 [109 P.2d 942].) The mere possession by some official body, such as the board, of a 'continuing supervisory or investigatory power' does not itself suffice to afford an administrative remedy. There must be 'clearly defined machinery' for the submission, evaluation and resolution of complaints by aggrieved parties."

■ In either case, the procedure offered must be fair. "[A] basic ingredient of the 'fair procedure' required under the common law is that an individual who will be adversely affected by a decision be afforded some meaningful opportunity to be heard in his defense. Every one of the numerous common law precedents in the area establishes that this element is indispensable to a fair procedure." (*Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253].)

■ A procedure which does not even afford the complaining (or subject) party a right to be heard, simply does not constitute an adequate "remedy."

would be interfering with the subject matter jurisdiction of another tribunal.' (3 Witkin, Cal. Procedure, [(3d. ed, 1985) Actions,] § 234, at p. 265, italics in original.)" The rule requiring exhaustion of internal remedies provided by a private organization "is analogous to the rule requiring the exhaustion of administrative remedies as a condition precedent to resorting to the courts . . . ." (*Holderby v. Internat. Union etc. Engrs.* (1955) 45 Cal.2d 843, 846 [291 P.2d 463].) Code of Civil Procedure section 1094.5, the writ of mandate procedure applicable to any challenge of a final internal decision within a hospital, specifies in subdivision (d) that an abuse of discretion is established only "if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

"To be adequate, a remedy must afford the individual fair procedure rights. (*Tiholiz v. Northridge Hospital Foundation* (1984) 151 Cal.App.3d 1197, 1202 [199 Cal.Rptr. 338].) . . . The concept of 'fair procedure' does not require rigid adherence to any particular procedure, to bylaws or timetables. (*Tiholiz v. Northridge Hospital Foundation, supra*, 151 Cal.App.3d 1197, 1203.) At a minimum, however, fair procedure requires adequate notice of the administrative action proposed or taken by the group or institution and a reasonable opportunity to be heard. (*Id.* at p. 1202.)" (*Bollengier v. Doctors Medical Center, supra*, 222 Cal.App.3d 1115, 1128–1129.)

In this case, Payne's complaint demonstrates he would be both a complaining physician under Article X of the bylaws, and the subject of someone else's complaint. His complaint was about racist behavior (by Dr. Shapiro and others), which affected his ability to practice as well as the quality of care rendered to minority patients. As to that assertion, the medical staff bylaws offer Payne no right to any hearing, ever. He merely has a right to file a written grievance pursuant to Article X, and his part is done. Only if the Medical Executive Committee agrees that some other physician acted inappropriately, and only if that misconduct is so severe that formal action is taken to restrict that physician's staff privileges, is a hearing required. But even if those things occur, and a hearing right is triggered under Article XI, the procedural rights and protections set forth in Article XI belong *to the physician whose privileges are at issue*, not to the complainant. The complainant has no procedural rights.

■    Such a procedure could never be viewed as a sufficient remedy for the complaining physician, supplanting his or her right to a hearing on the merits in court. Moreover, as explained by the Supreme Court in *Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 342–343 [124 Cal.Rptr. 513, 540 P.2d 609], a simple internal grievance procedure intended to address individual complaints, even if appropriate for that purpose, may be an inadequate remedy to address and resolve more complicated issues. In *Glendale*, the defendant asserted that its internal process was the exclusive means for employees to contest the enforceability of a memorandum of understanding. The court disagreed: "A procedure which provides merely for the submission of a grievance form, without the taking of testimony, the submission of legal briefs, or resolution by an impartial finder of fact is manifestly inadequate to handle disputes of the crucial and complex nature of the instant case . . . ." (*Ibid.*)

In this case, as in *Glendale City Employees' Assn., Inc. v. City of Glendale, supra*, 15 Cal.3d at page 342, Payne's allegations against his coworkers present complex issues—a pattern of racist conduct intended to provide his minority patients with a lesser standard of care, and to interfere with his own

ability to care for them. Unless we simply assume Payne's allegations are unfounded, which we are not permitted to do in connection with a motion on the pleadings, we cannot agree that the procedure outlined in Article X, which, as in *Glendale City Employees Assn., Inc. v. City of Glendale, supra*, 15 Cal.3d at page 342,"provides merely for the submission of a grievance form, without the taking of testimony, the submission of legal briefs, or resolution by an impartial finder of fact" is adequate to resolve them.

As a complained-about physician, Payne alleges that a surgical sub-committee was convened, without notice to him, and assigned blame to him for a surgical complication, without affording him any opportunity to be heard. Under Article X, he was entitled to no more. Article X provides that subcommittees may be appointed to consider specific complaints against physicians, and may issue reports concerning those complaints without interviewing any person, including the subject physician. Unless the Medical Executive Committee recommended some formal restriction on Payne's right to practice, which it did not, he had no right to any hearing. And he got none.[7]

Our dissenting colleague nonetheless suggests that Payne should have been obligated to follow the internal procedures offered in the bylaws, because it might have been beneficial in achieving a resolution of the issues alleged in the complaint. But that is not the test for what constitutes a proper alternative remedy, or whether exhaustion is required. An argument could be made that complaining internally might make a difference in most cases, but we do not preclude lawsuits merely because an internal remedy would be preferable.[8]

---

[7] The fact that respondent actually accorded Payne all of the procedural rights due to him under the bylaws does not render the process "fair." In *Ascherman v. Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507 [119 Cal.Rptr. 507], the hospital refused to consider the plaintiff's application for admittance to its medical staff, because the application did not include letters of recommendation by other staff members, as specifically required in the bylaws. The hospital did not, however, "reject" his application, which would have triggered a right to a hearing pursuant to Article III of its staff bylaws. The court held that although the hospital complied with its bylaws, it did not accord the physician a fair process. "While the physician was notified of the reason for the hospital's refusal to consider his application (the failure to have the requisite number of letters from staff members), he was not given a fair opportunity to defend himself. . . . [¶] We conclude that the by-law in the instant case that served to preclude consideration of the physician's application also violated the minimal common law standards of a fair procedure." (45 Cal.App.3d at p. 514.)

[8] Our dissenting colleague also notes that Dr. Payne did not attach the bylaws to his complaint and takes him to task for "attempting to plead around the well-settled principles of law set forth above." (Dis. opn., *post*, at p. 752.) But as he points out, "exhaus[tion of] remedies is routinely raised by affirmative defense . . . [and] can also be the basis for a demurrer or a motion for judgment on the pleadings." (*Id.*, at p. 753.) In the case of the demurrer or motion for judgment on the pleadings, the defendant usually (as did Anaheim Memorial in this case) asks the court to take judicial notice of some document which

In this case, such a remedy was not offered, as Anaheim Memorial chose not to provide a hearing process amenable to resolving Payne's specific complaints. It could have offered such a remedy, but chose instead to offer a hearing process, under Article XI of the bylaws, only in the event that formal action was to be taken to reject or restrict privileges. This provision of the bylaws was obviously drawn to provide the minimum process required by statute (Bus. & Prof. Code, §§ 805, 809.1–809.4). And it is fine as far as it goes. But it stops well short of situations such as this and the fact it provides adequate process in *other* situations provides neither succor nor fairness here.

By comparison, in *Charles J. Rounds v. Joint Council of Teamsters No. 42* (1971) 4 Cal.3d 888, 892–893 [95 Cal.Rptr. 53, 484 P.2d 1397], the provision at issue broadly governed " '[a]ll grievances, other than jurisdictional disputes, arising out of the interpretation or application of any of the terms or conditions of this agreement . . . .' " Were such a provision in place here, Payne would have had his internal remedy, and this lawsuit might not have been necessary.

■ But having offered Payne no "quasi-judicial remedy" to address his grievance, we cannot permit Anaheim Memorial to assert the exhaustion doctrine as a means of depriving him of an *actual* judicial remedy. " ' "The rule that a party must exhaust his administrative remedies prior to seeking relief in the courts 'has no application in a situation where an administrative remedy is unavailable or inadequate.' (*Martino v. Concord Community Hospital Dist.*[, *supra,*] 233 Cal.App.2d 51, 56 . . . .)" (*Diaz v. Quitoriano* [(1969)] 268 Cal.App.2d 807, 812 [74 Cal.Rptr.358] . . . .)' (*Ramos v. County of Madera* (1971) 4 Cal.3d 685, 691 [94 Cal.Rptr. 421, 484 P.2d 93], fn. omitted.)" (*Anton v. San Antonio Community Hosp., supra,* 19 Cal.3d 802, 829; see also *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 217 [188 Cal.Rptr. 115, 655 P.2d 317].)

Anaheim Memorial cites numerous cases intended to demonstrate that the principles enunciated in *Westlake* are applicable in various contexts, including situations where a physician is complaining of less than a total loss or denial of medical staff privileges. As it explains, "the *Westlake* doctrine has been applied broadly to *any* grievance which can be remedied by the internal procedures of *any* organization." The flaw in this argument, however, is that

---

establishes the existence of the purported remedy. Because the issue is a defense, the burden is on the defendant to raise it and ultimately to establish it. We are hard pressed to find anything surreptitious in a failure to negate an affirmative defense in the complaint.

In any event, Payne specifically alleges he made significant efforts to have his concerns addressed internally at the hospital. As a result of his efforts, respondent ultimately agreed to hire an independent attorney to investigate the racism issue, and to share the results of that investigation with Payne. However, respondent did not follow through on that promise, and, in fact, explicitly refused to give him the promised report.

the rule does require the existence of some quasi-judicial "internal procedure" to remedy the grievance at issue.

The fact that the bylaws of Anaheim Memorial gave Payne the right to complain, and that the hospital would employ some administrative process in rejecting (or simply choosing to ignore) his complaint is of no moment. The issue is whether the process it employed constituted an adequate internal procedure to fairly resolve the problem. In *Westlake*, the plaintiff had been rejected at two hospitals, and like Payne, wanted to fight about it. Her right to proceed directly to court to wage that fight was dependent upon whether the hospital whose *decision* she sought to challenge had afforded her some quasi-judicial process by which she could do so internally. The one that did (Westlake), won. The one that did not (Los Robles) was left to defend its conduct in a tort action.

Thus, the question in this case is whether Payne had a right to any quasi-judicial internal process by which he could contest the medical staff's initial rejection of his complaint, and its decision to assign him blame for a surgical complication he believed was the result of that racism. He did not. Consequently, he was not obligated to "exhaust" that remedy before proceeding in court.

## II

Anaheim Memorial also argues that even if Payne had exhausted whatever administrative remedies he had, he was still required to challenge the hospital's ultimate decision by way of a writ of mandate before he could proceed with any claim for damages. Alternatively, it asserts that if Payne is merely complaining about the inadequacy of those internal procedures, he was obligated to seek a writ challenging the adequacy of the internal remedy afforded him. We are not persuaded.[9]

■ As the Supreme Court made clear in *Westlake Community Hosp. v. Superior Court, supra*, 17 Cal.3d 465, a physician is only required to proceed by writ of mandate to challenge a medical staff decision when that decision was reached in a quasi-judicial proceeding. This one was not.

■ Moreover, even if Payne were primarily complaining about the inadequacy of the administrative procedures offered by Anaheim Memorial's

---

[9] When Payne responded to this argument in his reply brief, Anaheim Memorial promptly moved to strike the reply brief on the ground it raised new issues not addressed in Payne's opening brief. That motion is denied. Payne's opening brief addressed each of the grounds cited by the trial court as the basis for its ruling against him. When Anaheim Memorial used its respondent's brief to justify the court's decision based upon an additional aspect of the exhaustion doctrine, Payne could properly respond to that contention in his reply brief.

medical staff, he would still not be entitled, let alone obligated, to pursue writ relief. Code of Civil Procedure section 1085, subdivision (a) provides: "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by such inferior tribunal, corporation, board, or person." As explained in *Haller v. Burbank Community Hospital Foundation* (1983) 149 Cal.App.3d 650, 658 [197 Cal.Rptr. 45], "Code of Civil Procedure section 1085 anticipates the arbitrary or improper refusal by an association to hold a hearing and authorizes resort to a writ of mandate to compel such a hearing."

█ In this case, however, Anaheim Memorial did not refuse Payne any hearing to which he was entitled under the medical staff bylaws, as happened in *Haller*. Instead, it simply did not provide for any such right. "The purpose of a writ of mandamus is to *enforce a clear legal right* of the particular petitioner *against one who has a legal duty to perform* an act necessary to the enjoyment of such right." (*Farrington v. Fairfield* (1961) 194 Cal.App.2d 237, 239 [16 Cal.Rptr. 119], italics added.) Where, as here, the bylaws afforded Payne no legal right to a hearing or other process, there is no legal right for the courts to enforce.

█ A writ of mandate proceeding does not empower the courts to rewrite the bylaws of a medical staff, either to create an administrative hearing procedure which did not previously exist, or to expand the scope of an existing hearing procedure to govern a situation it was not originally intended to address. Because the medical staff did not refuse Payne any procedural remedy to which he was entitled under the provisions of the medical staff bylaws, he was not obligated to seek any writ relief compelling it to act differently.

### III

█ Finally, we turn to the issue of whether Payne has stated a claim for relief pursuant to the UCRA. Technically, the trial court did not rule on this issue, noting merely that Payne "may not" have standing to assert such a claim. Nonetheless, the issue of standing is so fundamental that it need not even be raised below—let alone decided—as a prerequisite to our consideration. (*McKeon v. Hastings College* (1986) 185 Cal.App.3d 877, 890 [230 Cal.Rptr. 176] [issue of standing maybe raised for he first time on appeal].)

█ As explained in *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502 [82 Cal.Rptr.2d 368], the UCRA "prohibits arbitrary discrimination

by businesses on the basis of specified classifications such as age. (§ 51; see *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155 [278 Cal.Rptr. 614, 805 P.2d 873].) The Act must be liberally construed to accomplish this purpose. (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28 [219 Cal.Rptr. 133, 707 P.2d 195]; *Winchell v. English* (1976) 62 Cal.App.3d 125 [133 Cal.Rptr. 20].)"

As set forth in Civil Code section 51, subdivision (b), the UCRA specifically requires that all persons, "no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Payne alleged, in paragraph 21 of his first amended complaint, that Anaheim Memorial operates the hospital as a business, and makes its facilities available to physicians for use in surgery and other treatment of patients. He further alleges that Anaheim Memorial breached the provisions of the act when it failed to address racist conduct which impaired the access of minority physicians and patients to that facility. We think those allegations, if proven, are sufficient to state a claim. "A common law motion for judgment on the pleadings 'ha[s] the purpose and effect of a general demurrer.' (*Kortmeyer v. California Ins. Guarantee Assn.* (1992) 9 Cal.App.4th 1285, 1293 [12 Cal.Rptr.2d 71].)" (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146 [44 Cal.Rptr.2d 441, 900 P.2d 690].) "It has long been the rule of this state that objections that a complaint is ambiguous or uncertain, or that essential facts appear only inferentially, or as conclusions of law, or by way of recitals, must be raised by special demurrer, and cannot be reached on general demurrer." (*Johnson v. Mead* (1987) 191 Cal.App.3d 156, 160 [236 Cal.Rptr. 277], italics omitted.)

Anaheim Memorial asks us to ignore the requirement that the UCRA be liberally construed, and instead interpret it narrowly, based upon *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216], in which the Supreme Court concluded the UCRA was not intended to govern the employment relationship. As the court there explained, "there is no indication that the Legislature intended to broaden the scope of [the UCRA] to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." (*Id.* at p. 500.) However, the Supreme Court itself has expressly eschewed such a narrow construction in *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212].

In *Isbister,* the court concluded that a Boys' Club facility was subject to the UCRA, despite the fact it was not even a commercial entity. As the court explained, "*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86

Cal.Rptr. 88, 468 P.2d 216] is not contrary. . . . In context, the [quoted] statement meant only that the employer-employee relationship was not covered by the Act, which was confined to discriminations against recipients of the 'business establishment's . . . goods, services or facilities.' Discrimination in services and facilities is precisely what is alleged here." (*Isbister v. Boys' Club of Santa Cruz, Inc., supra,* 40 Cal.3d at p. 83, fn. 12, italics omitted.)

Moreover, in *Alcorn* itself, the court made clear that the exclusion of the employment relationship from the protection of the UCRA was based upon a determination that the Legislature's enactment of the Fair Employment and Housing Act (FEHA) concurrently with the UCRA "indicated a legislative intent to exclude the subject of discrimination in employment from the latter act." (*Alcorn v. Anbro Engineering, Inc., supra,* 2 Cal.3d, at p. 500.) In other words, the issue of discrimination within the employment relationship was excluded from the UCRA, not because it was undeserving of attention, but because it was specifically addressed within a different statutory scheme.

Anaheim Memorial has not cited us to any cases precluding application of the UCRA based upon the parties' relationship, other than in the employment context. Instead, it relies upon *Strother v. Southern California Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, for the proposition that physicians are somehow exempt from the protections of the civil rights law, and argues that because the physician's professional access to hospital facilities arises out of his or her membership in "an elite club," the physician's interest in accessing those facilities free from discrimination is somehow not deserving of the protections of the UCRA. We disagree.

*Strother v. Southern California Permanente Medical Group, supra*, 79 F.3d 859, states no blanket rule which would suggest physicians are not covered by the UCRA in connection with their professional relationships. In *Strother,* the physician plaintiff was asserting a claim against the medical group for which she worked (and in which she herself was a partner), and not against a hospital. She alleged violations of both the FEHA and the UCRA. After the lower court summarily disposed of all her claims, she appealed, and the court of appeals reversed the judgment with respect to her FEHA claim. The court concluded there were triable issues of fact as to that claim because her status as a partner in the medical group did not necessarily preclude her from also being considered an "employee" for purposes of FEHA protections. Consistent with that analysis, the court then concluded that even if the physician were ultimately determined not to be an "employee," the physician's relationship with her medical group was nonetheless more closely analogous to an employer-employee relationship than it was to a

customer-proprietor relationship and was thus not intended to be governed by the UCRA.[10]

In this case, by contrast, the relationship at issue is between a physician and a hospital. Anaheim Memorial does not even suggest the relationship might be one of employer and employee, which would be governed by the FEHA, and we assume it would protest mightily if Payne attempted to do so.[11] Payne does not work for the hospital, and has no obligation to treat his patients there as opposed to any other hospital. Anaheim Memorial does not compensate Payne for his medical services, nor does it exercise any direct control over the manner in which he practices. Instead, the hospital merely provides a facility which a qualified physician may access in connection with providing medical care to his patients.

The fact that the facilities offered to physicians by Anaheim Memorial are not offered to all members of the public, and are contingent upon what the hospital characterizes as the recipient's "elite" status as a physician, is irrelevant. Application of the UCRA is not restricted to those businesses or public facilities which offer their wares or services to everyone. If that were true, then automobile rental companies would be exempt from its strictures, since they offer their services only to those members of that public who have obtained a special driving credential. Despite the fact that they cater to only a specially licensed segment of the public, no one could seriously assert that a car rental company would be free to further restrict the pool of its customers to licensed drivers of Caucasian heritage.

The analysis for a hospital is much the same. It is a business which offers facilities and services utilized only in connection with the practice of medicine. It allows only licensed physicians to utilize its facilities for the purpose of practicing medicine, because only they are legally qualified to do so. But the hospital, having reasonably restricted its staff privileges to only qualified physicians, cannot then further restrict that group on the basis of race.

---

[10] We do not necessarily agree with the Ninth Circuit's conclusion to the extent it suggests the physician might be ultimately be denied a remedy under either the FEHA or the UCRA. As we have already explained, *Alcorn v. Anbro Engineering, Inc., supra*, 2 Cal.3d 493, made clear that the exclusion of employees from the UCRA was a direct result of that relationship being expressly governed by the FEHA. If, however, the relationship in *Strother v. Southern California Permanente Medical Group, supra*, 79 F.3d 859, were ultimately deemed not to be one of employee-employer, then the rationale for excluding it from the UCRA disappears.

[11] As explained in the recent case of *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074 [6 Cal.Rptr.3d 457, 79 P.3d 569], if an employee's claim arises under the FEHA, the employee is not required to exhaust both his employer's internal administrative remedies and those of the FEHA, before pursuing a claim for damages in court. It is sufficient if the employee complies with the administrative requirements of the FEHA.

Finally, we also find irrelevant Anaheim Memorial's contention that the patients of a hospital would necessarily be considered its "clients, patrons or customers" for purposes of the UCRA. It implicitly suggests that if the patients are customers or patrons, then the physicians cannot also be considered such. However, Anaheim Memorial has cited us no authority suggesting the protections of the UCRA have ever been restricted to only one type of customer for each business, or would apply to only one type of facility or service offered, such that the entity would then be free to discriminate in connection with other aspects of its operations. We are not inclined to announce such a rule here.

In fine, the court erred in granting the judgment on the pleadings. The judgment is reversed and the case remanded.

Aronson, J., concurred.

**FYBEL, J.,** Dissenting.—I respectfully dissent. For the reasons explained in detail below, I believe the majority's holdings are unprecedented, incorrect, and contrary to California Supreme Court decisions. The two dispositive questions presented by this appeal are and our answers to them should be:

First, should the Unruh Civil Rights Act be extended to cover for the first time a physician who works as an independent contractor in a hospital?[1] No. To create liability to this plaintiff under the Unruh Civil Rights Act based on the pleadings in this case is unprecedented and, I believe, contrary to authority.

Second, must a physician claiming tort damages resulting from the failure of a hospital to fairly investigate and act on claims of racial discrimination allege invocation and exhaustion of the hospital's internal remedies? Yes. Where, as here, the hospital has internal procedures to address requests for corrective action for discriminatory or harassing conduct, those internal procedures must be invoked and exhausted before a civil lawsuit is instituted. Plaintiff Dr. David H. Payne failed to allege invocation and exhaustion of internal remedies; therefore, his civil lawsuit for damages does not withstand a motion for judgment on the pleadings. I also disagree with the majority's conclusion that this court should deem the remedies inadequate, even though Dr. Payne's complaint never alleged such inadequacy.

---

[1] The Unruh Civil Rights Act is codified at Civil Code section 51. I will sometimes refer to this statute as the Act.

I.

UNRUH CIVIL RIGHTS ACT

The Unruh Civil Rights Act, Civil Code section 51, subdivision (b), provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Our Supreme Court has interpreted the Act " 'in the broadest sense reasonably possible.' " (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 76 [219 Cal.Rptr. 150, 707 P.2d 212] (*Isbister*).) Nevertheless, our Supreme Court has also held, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers. [Citation.]" (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 500 [86 Cal.Rptr. 88, 468 P.2d 216] (*Alcorn*).)

In particular, the Act does not apply to discrimination within the employment relationship. (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 77 [276 Cal.Rptr. 130, 801 P.2d 373] ["the Unruh Civil Rights Act has no application to employment discrimination"]; *Isbister, supra,* 40 Cal.3d at p. 83, fn. 12 ["the *employer-employee* relationship was not covered by the Act, which was confined to discriminations against recipients of the 'business establishment's . . . goods, services or facilities' "]; *Alcorn, supra,* 2 Cal.3d at p. 500 [affirming dismissal of terminated employee's Unruh Civil Rights Act claim against former employer because "it is doubtful that the Legislature intended these sections to apply to discrimination in employment"]; *Jurado v. Eleven-Fifty Corp.* (C.D.Cal. 1985) 630 F.Supp. 569, 573; see 2 Wilcox, Cal. Employment Law (2004) Overview, § 40.12[1], pp. 40-32 to 40-33 (rel. 23-3/01).)

This limitation on the Act's application extends to employment discrimination between those not in a traditional employer-employee relationship. (See 3 Wilcox, Cal. Employment Law, *supra,* Agency Enforcement, § 42.01[2][b], p. 42-14 & fn. 22 (rel. 23-3/01).) In *Strother v. Southern Cal. Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 863, a medical doctor sued the medical group of which she was a partner, alleging racial and gender discrimination. The court of appeals affirmed the grant of summary judgment on the plaintiff's claim for violation of the Act. (*Id.* at pp. 874–875.) "Strother argues that she is protected by the Unruh [Civil Rights] Act because in her position at the Medical Group she is 'entitled to receive economic benefits, the use of certain medical facilities, medical supplies and other goods, management courses, and a variety of privileges, advantages, and

services, including opportunities for promotion and advancement.' These benefits, however, are no different than those that would be received by any doctor who was, as she once was, a mere employee of the Medical Group. Being a 'recipient' of these benefits does not entitle Strother to the protection of the Unruh Act any more than an employee's being the 'recipient' of a paycheck gives him or her Unruh Act protection. Even if Strother were considered a bona fide partner rather than an 'employee' for the purpose of [California's Fair Employment and Housing Act], her relationship to the Medical Group is more like that of an employee than that of a 'client, patron or customer.' " (*Id.* at p. 874.) *Strother v. Southern Cal. Permanente Medical Group* does not create a special rule that the Act does not apply to physicians. Rather, the case stands for the unremarkable proposition that the Act does not apply to employment discrimination claims, whether the parties have a traditional employer-employee relationship or something else.

In *Dept. Fair Empl. & Hous. v. Children's Hospital and Health Center* (1987) No. 87-24, FEHC Precedential Decs. 1986–1987, CEB 10, the Fair Employment and Housing Commission concluded that, as with employer-employee relationships, the Act does not apply when an independent contractor claims discrimination by its employer. (See also *Sprewell v. Golden State Warriors* (9th Cir. 2001) 266 F.3d 979, 989 [Unruh Civil Rights Act claim properly dismissed because player's suspension by the National Basketball Association (NBA) and termination of player's contract by team both "stemmed from [NBA player's] employment relationships"]; *Robinson v. Ladd Furniture, Inc.* (M.D.N.C. 1994) 872 F.Supp. 248, 250 [referring to earlier ruling which dismissed Unruh Civil Rights Act claim because "this Act does not apply to claims of discrimination in employment either as an independent contractor or as an employee"]; *Gauvin v. Trombatore* (N.D.Cal. 1988) 682 F.Supp. 1067, 1073 [Unruh Civil Rights Act does not apply to discrimination in employment "regardless of whether the relationship between the parties is characterized as employer-employee or contractor-subcontractor"].) These cases were recently cited and relied on in *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 393–394 [19 Cal.Rptr.3d 29], in interpreting the Act's application.

The majority asserts that our Supreme Court has expressly "eschewed" the construction of the Act set forth in *Alcorn, supra,* 2 Cal.3d 493, 500 (which is cited above); the majority cites *Isbister, supra,* 40 Cal.3d at page 83, footnote 12, for this proposition. In *Isbister,* however, the Supreme Court held that the Act could apply to a noncommercial entity, and that the holding of *Alcorn* that the Act applies only to discriminations against recipients of a business establishment's goods, services or facilities did not bar a claim against the Boys' Club. The footnote from *Isbister,* on which the majority relies, addresses only the definition of "business establishment" for purposes of the Act's application. The question here is whether the relationship between

Dr. Payne and Anaheim Memorial Medical Center, Inc. (the Hospital) is an employment relationship, and thus removed from the Act's reach, not whether the Hospital is a business establishment. The requirement, established by our Supreme Court over 35 years ago in *Alcorn*, that a plaintiff suing under the Act be a client, patron, or customer, is still alive and well. (See *Alch v. Superior Court, supra,* 122 Cal.App.4th at pp. 393–394.)

In this case, Dr. Payne conspicuously avoided including in his complaint *any* allegations relating to his status vis-à-vis the Hospital. He never alleged whether he was an employee, an independent contractor, a volunteer, or something else. In his opening appellate brief, however, Dr. Payne acknowledges he was "not an employee of the Hospital, but practices at the hospital facilities independently. [He] generally receives no wages directly from the hospital, and is responsible for his or her own billing to patients."

California law effectively prohibits hospitals and the physicians who work in them from being in an employer-employee relationship. (Bus. & Prof. Code, §§ 2285, 2400.) If a physician could be directly employed by a hospital, he or she would unquestionably lack standing to sue the hospital for violating the Act by discriminating against him or her. The fact a physician is an independent contractor rather than an employee should not change this rule. I believe the majority's contrary decision is legally unsupportable and a novel extension of the Act.

Experience tells me why Dr. Payne pleaded his case the way he did. He did not attach the Hospital's bylaws to the complaint; he did not explain or describe his status at the Hospital (as an independent contractor or otherwise) other than to allege he had privileges at the Hospital; he did not allege he was a client, patron, or customer of the Hospital as would be required by 35-year-old authority from the California Supreme Court interpreting the Act (*Alcorn v. Anbro Engineering, Inc., supra,* 2 Cal.3d at p. 500);[2] and he chose not to amend the complaint after the trial court granted the motion for judgment on the pleadings. Instead, Dr. Payne included allegations purporting to show he was discriminated against by the poor care rendered to one patient, without any legal or analytical support. The language of the complaint shows, I believe, that Dr. Payne was attempting to plead around the well-settled principles of law set forth above, or simply ignore them. I recognize that the law requires that Dr. Payne's complaint be construed liberally. But this rule does not mean the many blanks left by Dr. Payne

---

[2] The closest Dr. Payne comes is on page 8 of his complaint where he alleged the Hospital "fail[ed] to affirmatively protect classes of minority employees, privileged physicians, and patients to provide[] unencumbered equal access to its business facilities, including those for surgery and post-operative treatment." But Dr. Payne did not allege (nor presumably could he) that *he* was denied access to treatment.

should be filled in so as to judicially create standing when no basis for it has been pleaded.[3] The majority's extension of the Act is unprecedented and contrary to all authority cited in its own opinion and in this dissent.

## II.

### Negligent Infliction of Emotional Distress

When the parties' agreement provides for a particular remedy, and the plaintiff does not pursue that remedy before filing a lawsuit, failure to exhaust remedies is routinely raised by affirmative defense. It can also be the basis for a demurrer or a motion for judgment on the pleadings. (*Charles J. Rounds Co. v. Joint Council of Teamsters No. 42* (1971) 4 Cal.3d 888, 899 [95 Cal.Rptr. 53, 484 P.2d 1397] [the plaintiff failed to arbitrate before filing lawsuit]; *De Gonia v. Building Material etc. Union* (1957) 155 Cal.App.2d 573 [318 P.2d 486].)

Did Dr. Payne allege he exhausted his internal remedies? No. Dr. Payne did not allege that the bylaws provided internal remedies, or that he invoked or exhausted those remedies. Did Dr. Payne need to exhaust his internal remedies? Yes. As our Supreme Court has explained, "[i]t is the general and well established jurisdictional rule that a plaintiff who seeks judicial relief against an organization of which he is a member must first invoke and exhaust the remedies provided by that organization applicable to his grievance. [Citations.] This rule is analogous to the rule requiring the exhaustion of administrative remedies as a condition precedent to resorting to the courts [citation], and to the rule requiring the parties to a contract for arbitration of disputes to exhaust those remedies before seeking judicial relief. [Citations.] Such rules are based on a practical approach to the solution of internal problems, complaints and grievances that arise between parties functioning pursuant to special and complex agreements or other arrangements. They make possible the settlement of such matters by simple, expeditious and inexpensive procedures, and by persons who, generally, are familiar therewith. Such internal remedies are designed not only to promote the settlement of grievances but also to promote more harmonious relationships, and the courts look with favor upon them." (*Holderby v. Internat. Union etc. Engrs.* (1955) 45 Cal.2d 843, 846 [291 P.2d 463]; see *Palmer v. Regents of University of California* (2003) 107 Cal.App.4th 899, 904 [132 Cal.Rptr.2d 567] ["When a private association . . . establishes an internal grievance mechanism . . . failure to exhaust those internal remedies precludes any subsequent private civil action"].)

---

[3] Contrary to the majority's suggestion, this dissent does not rest on the belief that the complaint is " 'ambiguous or uncertain.' " I am construing Dr. Payne's complaint liberally. But the fact remains that his complaint does not allege the necessary *elements* of his claims, not that it is " 'ambiguous or uncertain.' "

This general rule should apply with equal force in the context of physicians practicing medicine in hospitals. Where a hospital provides a procedure to address the conduct complained of by the physician, the physician must first exhaust those internal remedies before seeking judicial relief. (*Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 474–475 [131 Cal.Rptr. 90, 551 P.2d 410] (*Westlake*).) Dr. Payne chose not to amend his complaint after the trial court granted the motion for judgment on the pleadings; I presume the complaint states Dr. Payne's strongest possible case. (*Soliz v. Williams* (1999) 74 Cal.App.4th 577, 585 [88 Cal.Rptr.2d 184].)

The bylaws provide a procedure by which any member of the Hospital's medical staff may seek corrective action. Paragraph 10.1.1 of the bylaws permits a staff member to initiate a request for corrective action when any physician's activities or professional conduct (including, but not limited to, harassment) (1) are detrimental to patient safety or the delivery of high quality medical care, (2) are considered to be lower than the standards or aims of the medical staff, or (3) are disruptive to the Hospital's operations. Paragraph 10.1.2 provides: "All requests for corrective action shall be in writing, submitted to the Medical Executive Committee, and supported by a reference to the specific activities or conduct which constitute the grounds for the request." Dr. Payne did not allege the existence of those provisions of the bylaws or that he made a written request for corrective action or stated the grounds for the request in writing. Thus, Dr. Payne did not invoke or exhaust his internal remedies.

Internal remedies need not be exhausted if the remedies provided would be inadequate. (See *Campbell v. Regents of the University of Cal.* (2005) 35 Cal.4th 311, 322 [25 Cal.Rptr.3d 320, 106 P.3d 976].) Dr. Payne did not allege in his complaint that the internal remedies provided by the Hospital's bylaws existed or would have been inadequate. I do not believe an appellate court should read into the complaint an allegation of inadequacy of the remedy when Dr. Payne did not so plead, even after he was given an opportunity to amend. I also do not believe an appellate court should engage in guesswork as to what would have happened if a sufficient request for corrective action had been made by Dr. Payne, and if he had explained the grounds for his request to the appropriate Hospital committee at the appropriate time. Unlike my colleagues in the majority, I do not believe we can say as a matter of law that the remedy would have been inadequate, and I therefore decline Dr. Payne's invitation to insert allegations into his complaint and then to determine they are sufficient.

Dr. Payne argues that *Westlake* applies only to cases involving denial or loss of medical privileges, and that this case is not one involving a loss of privileges. I believe that Dr. Payne is fundamentally incorrect on both points.

Although the physician in *Westlake* had been denied privileges at one hospital and had her privileges revoked at another (*Westlake, supra,* 17 Cal.3d at p. 470), the rule of that case cannot be limited to those specific factual circumstances. The requirement that a physician exhaust internal remedies before filing a civil action has been applied where some, but not all, of the physician's privileges have been suspended (*Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 92 & fn. 3 [26 Cal.Rptr.3d 744]), and where a physician's patients' charts were to be audited and the physician's performance was to be monitored (*McNair v. Pasadena Hospital Assn., Ltd.* (1980) 111 Cal.App.3d 841, 843–844 [169 Cal.Rptr. 39]).

The purpose of requiring that a physician exhaust his or her internal remedies is to encourage the resolution of problems more quickly and appropriately. Our Supreme Court has explained the underlying rationale for this rule as follows: "[A]n exhaustion of remedies requirement serves the salutary function of eliminating or mitigating damages. If an organization is given the opportunity quickly to determine through the operation of its internal procedures that it has committed error, it may be able to minimize, and sometimes eliminate, any monetary injury to the plaintiff by immediately reversing its initial decision and affording the aggrieved party all membership rights; an individual should not be permitted to increase damages by foregoing available internal remedies. [Citation.] [¶] Moreover, by insisting upon exhaustion even in these circumstances, courts accord recognition to the 'expertise' of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance. [Citation.] Finally, even if the absence of an internal damage remedy makes ultimate resort to the courts inevitable [citation], the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review." (*Westlake, supra,* 17 Cal.3d at p. 476.) Here, it seems to me that following the procedures set forth in the bylaws would have permitted the Hospital to have achieved, or attempted to achieve, these goals.

These goals are equally applicable when a physician's privileges are negatively impacted rather than terminated. Indeed, *Westlake* must apply to employment actions less than revocation or denial of privileges for the simple reason that a contrary rule might result in harsher actions being taken against physicians by hospitals. "A contrary result would leave hospitals and persons who serve on committees which police medical personnel vulnerable to an immediate suit for damages by a disgruntled physician. This might provide them with encouragement to terminate staff privileges completely rather than impose some lesser discipline which might be both appropriate and sufficient. We don't wish to provide that encouragement." (*McNair v. Pasadena Hospital Assn., Ltd., supra,* 111 Cal.App.3d at p. 846.)

Additionally, contrary to Dr. Payne's argument, I believe this *is* a case about an alleged negative impact on medical privileges. In his complaint, Dr. Payne alleged, among other things: the Hospital, through its agents and employees, had engaged in a "pattern of emotionally and professionally debilitating interference with [his] use of [the Hospital]'s business facilities"; the actions of the Hospital and Dr. Siegel resulted in a monitoring surgeon overseeing Dr. Payne's surgical work; the peer review meetings conducted by the Hospital's medical staff "could affect [his] staff privileges"; "in reality, and as all physicians know, *all* surgery evaluations affect staff privileges since one cannot 'un-ring the bell of criticism' if and when such information may subsequently be relied upon when evaluating future staff privileges"; and the Hospital "engaged in a well-orchestrated surreptitiously executed plan of harassment and intimidation of [Dr. Payne] of such magnitude and scope that [he] was effectively barred from practicing medicine at [the Hospital]."

In my view, the majority has read into the complaint facts necessary to sustain Dr. Payne's complaint that were clearly not alleged in the complaint itself, nor asserted in other filings or in the appellate briefs. I respectfully disagree with my colleagues' actions as well beyond and indeed contrary to legal authority.

*Westlake* also requires that, after exhausting internal remedies, a potential litigant pursue the judicial remedy of a writ of mandate before instituting a lawsuit. (*Westlake, supra,* 17 Cal.3d at p. 484.) I believe Dr. Payne's failure to comply with this requirement provides a second, separate ground for affirming the judgment.

Finally, I wish to respond directly to the majority's references to fairness. I agree wholeheartedly that racial discrimination is a horrible offense and a serious charge. But I also believe fairness is a two-way street. Our law, as described above, and fairness require certain prerequisites to filing in civil court a lawsuit for damages based on charges like those asserted in Dr. Payne's complaint. Based on consistent authority from the California Supreme Court, the California Courts of Appeal, the Ninth Circuit and federal district courts (applying California law), and the California Fair Employment and Housing Commission, the Unruh Civil Rights Act does not apply to Dr. Payne. It is precisely because racial discrimination is abhorrent and needs to be investigated and addressed that the Legislature and the courts have developed rules to be fair to the accused and the accuser alike.

In this case, the majority permits Dr. Payne to skip the rudimentary internal step of a written complaint and a statement of reasons. How simple can a step be? How many minutes would it have taken Dr. Payne to satisfy this basic step and give fair notice to the Hospital? The majority also takes the unprecedented step of permitting an independent contractor (liberally reading Dr. Payne's complaint to include his description of his capacity set forth in his appellate brief) to state a claim under the Unruh Civil Rights Act. The majority's result—though well-intentioned—conflicts with precedent and, yes, fairness.

A petition for a rehearing was denied July 20, 2006, and respondent's petition for review by the Supreme Court was denied October 21, 2005.